## UNITED STATES v. SANITARY DIST. OF CHICAGO et al.

### No. 8702.

Circuit Court of Appeals, Seventh Circuit.

June 21, 1945.

Rehearing Denied July 11, 1945.

952

J. Edward Williams, Acting Head, Lands Division, Department of Justice, Vernon L. Wilkinson and Roger P. Marquis, Attys., Department of Justice, all of Washington, D. C., and J. Albert Woll, U. S. Atty., of Chicago, Ill. (Lawrence D. Beukema, and Norvill B. Arnold, Defense Supplies Corporation, both of Washington, D. C., of counsel), for appellant.

Arthur Abraham and Thomas S. Edmonds, both of Chicago, Ill., for appellee.

Before SPARKS, KERNER, and MINTON, Circuit Judges.

KERNER, Circuit Judge.

The question presented by this appeal is the value to be placed upon the temporary use of respondents' leasehold and facilities which petitioner took by condemnation.

Feldmans, the respondents, had a 50-year ground lease from the Sanitary District of Chicago. They built 18 storage tanks thereon. In 1942 they entered into a contract with Defense Supplies Corporation, a wholly owned subsidiary of the Reconstruction Finance Corporation, for the storage of alcohol in 14 of their largest tanks. For receiving, unloading, storing, loading and shipping the alcohol, respondents were to receive slightly more than 5 cents per barrel. Effective June 1, 1943, the Office of Price Administration [1] placed a ceiling price on the "storage of alcohol for Defense Supplies Corporation" of 1 cent per barrel per month of tank capacity with an allowance of 2 cents per barrel for handling into storage and 2 cents per barrel for handling out of storage, to and from tank cars, the method generally used for transporting alcohol. Amendment No. 176 to Supplementary Regulation No. 14 to the General Maximum Price Regulation, 8 Fed. Reg. 7262. As a result of this regulation, Defense Supplies Corporation refused to pay storage charges in excess of 1 cent per barrel per month of tank capacity.

Soon after this regulation was passed, which had the effect of modifying the contract, Defense Supplies Corporation found it necessary to institute condemnation proceedings [2] in order to get the government-owned alcohol which was urgently needed for the manufacture of explosives. Only

[1] Pursuant to Section 4(a) of the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, 28, 50 U.S.C.A.Appendix, § 904, which was in force when the storage agreement was entered into with respondents, which provides that "It shall be unlawful, regardless of any contract, agreement, lease, or other obligation heretofore or hereafter entered into, for any person to sell or deliver any commodity, or in the course of trade or business to buy or receive any commodity, * * * in violation of [duly promulgated price schedules]." The term "commodity" is defined to include "services rendered * * * in connection with the * * * distribution, [or] storage * * * of a commodity * * *."

[2] Under the authority of the Second War Powers Act, 56 Stat. 177, 50 U.S.C.A.Appendix, § 632.

the use for 30 days was taken, subject to renewal for additional periods of 30 days. The petition for condemnation of the 14 storage tanks was filed October 26, 1943, and an order of immediate possession was signed the same day. On each successive 30-day period, the number of tanks taken was progressively reduced. The last tank was emptied during the 30-day period expiring May 22, 1944, and complete possession was thereupon returned to the Feldmans.

The total amount awarded respondents was $14,982, whereas the total amount deposited was $4,994. From a judgment directing the deposit into court of the deficiency of $9,988 plus interest, petitioner appealed.

The respondent Sanitary District of Chicago makes no claim for compensation because its interest in the property was not taken.

The contested issues are: (1) Whether the highest and only available use of the tanks for the short periods here involved was for the storage of alcohol, and (2) whether the maximum recovery which the court could allow was the OPA ceiling price of 1 cent per barrel per month.

Under the terms of the ground lease between the Feldmans and the Sanitary District of Chicago, the property could be used only for the storage of petroleum products and the storage of alcohol.

Respondents contend that the highest and best use of the property condemned on the date of taking was not the storage of alcohol and that in any event the price ceiling set by the Office of Price Administration is not controlling in a condemnation proceeding. On the other hand, petitioner contends that the highest and best use of the occupancy condemned on the date of condemnation was the storage of alcohol and that on said date the maximum price that could be paid for such storage pursuant to the Office of Price Administration Regulation constitutes the fair cash market value of the use condemned.

Both parties agree that the standard to be used in evaluating the amount of money which the condemnee should receive is the highest and best use of his property.

■ In cases of condemnation of private property for public use a wide variety of circumstances must be taken into consideration, including the condition of the property at the time it is taken, City of Chicago v. Jackson, 333 Ill. 345, 164 N.E. 659, and the real test on the question of damages is the present value and not its value at some future time. East St. Louis Light Co. v. Cohen, 333 Ill. 218, 164 N.E. 182. In our case, the court held that "Restricting the use of the tanks to the short periods taken by the petitioner * * *, it is clear from the evidence that the highest and best use of such short term storage facilities of the respondents would be 'Thru-Put' storage of petroleum products, that is, the temporary storage of petroleum products where the product comes in and out of the tanks in less than thirty days." In so ruling, petitioner asserts that the court ignored the indisputable fact that the tanks were already filled with alcohol so they could be used for no other purpose until the alcohol was removed. In other words, petitioner says it is not proper to value property in terms of a use to which it is physically impossible to put it.

The tanks were full of alcohol; and assuming that petitioner's view of the proper means of evaluation is correct, we are faced with the factual question, namely, within what period of time could the tanks be emptied of alcohol so as to become available for "through-put" storage of petroleum? The record before us is far from satisfactory on this issue. In petitioner's brief we find the assertion "The Government removed that alcohol from the 14 tanks in the shortest possible time," while in respondents' brief we find the assertion that "There is not a scintilla of evidence in the record to support this statement. It is untrue—in fact, it is not only untrue, it is absurd. The alcohol could readily have been removed in 30 days, the time ordinarily provided for making tanks ready for occupancy under contracts for the storage of petroleum products. The gasoline could have been put into the tanks at the same time, since the tanks would be emptied one at a time. Accordingly, the terminal could actually have been made immediately available for the 'through-put' storage of gasoline despite the presence of the alcohol."

■ The record discloses that Abraham Feldman testified on cross-examination, in speaking of the number of tank cars filled per day by pumping out the storage tanks, "I think we pumped [out] two or four cars, it varied." And in response to the question, "What is the most you have ever pumped out?" this witness stated, "The most I have ever pumped [out] was three

or four cars." There were 5,460,000 gallons stored in the storage tanks on October 26, 1943, the time of the taking. It appears that the average tank car holds 8,-000 gallons. Some hold 6,000, some 10,000. Ignoring the fact that tank cars were often difficult to get in that time of grave national transportation shortage due to the war demands, this means that at four cars per day, each car of 8,000 gallons, it would take 171 days to empty the tanks. This same witness testified that in the period just prior to the time of the condemnation, the Feldman Petroleum Company had been averaging two tank cars per day, i. e., filling two tank cars with alcohol from the storage tanks. At that rate, it would have taken approximately 342 days to get the alcohol out, as compared to the 210 days which the Government took to get it out.[3] If railway tank cars should not have been available, it would have taken correspondingly longer. Thus it is apparent that it would take a long period of time to get the alcohol out of the tanks, and that they could not, as respondents assert, be emptied in 30 days. Hence it appears that the facilities were presently available only for the storage of alcohol.

Nor can respondents object that they did not get the use of the emptied tanks, for as soon as the alcohol came out, the emptied tanks were immediately turned back to the Feldmans for any use they desired.[4]

The fact that these tanks after they were emptied might be used for gasoline "through-put" storage would have no effect on the amount which would be paid for the use of such facilities for the period prior to the time they were emptied—the only period involved in this proceeding. As pointed out in City of Chicago v. Lord, 276 Ill. 571, 575, 115 N.E. 397, 398, "In ascertaining the compensation to be made to the owner of property appropriated for a public use, he is entitled to its value for the most profitable use *for which it is available.* This availability, however, does not refer to a future possibility, but to a *present ca-pacity* for a use which may be anticipated with reasonable certainty and made the basis of an intelligent estimate of value." (Italics supplied) The value is to be fixed as of the date of the proceedings. United States v. Chandler-Dunbar Co., 229 U.S. 53, 76, 33 S.Ct. 667, 57 L.Ed. 1063, and East St. Louis Light Co. v. Cohen, supra.

Thus the trial court was not free, under the foregoing authorities, to disregard the fact that it was physically impossible to store gasoline in the tanks on the date of the taking while they were full of alcohol. The tanks were not "presently available" for gasoline "through-put" storage; they could not be used for that purpose until the alcohol was removed. Consequently, the highest and best use of the property and the only available use for the short periods here involved was for the storage of alcohol.

The authorities cited by respondents, United States ex rel. Tennessee Valley Authority v. Powelson, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; East Peoria Sanitary District v. Toledo, Peoria & Western R., 353 Ill. 296, 187 N.E. 512, 89 A.L.R. 870, do not lead to a different conclusion. They involved a permanent taking of land or a flowage easement, so the use to which the property taken could be converted was a proper consideration. But in the case at bar the tanks were taken only for 30-day periods in order to get the alcohol, so the sole and only use for which they were fitted for the period of condemnation was the storage of alcohol. Hence it was not proper to consider their value for another use to which they could be put *after* the alcohol was removed.

Since the highest and best use of the tanks for the short periods here involved was for the storage of alcohol, the maximum recovery which the trial court could allow was the OPA ceiling price for the storage of alcohol. Congress under its wartime powers may enact price control

| [3] | | | No. of Days | Approximate Storage Capacity Taken (In Barrels) |
|---|---|---|---|---|
| Period Taken | | | | |
| 10/26/43 to | 11/24/43 | | 30 | 145,000 |
| 11/25/43 to | 12/24/43 | | 30 | 120,000 |
| 12/25/43 to | 1/23/44 | | 30 | 95,000 |
| 1/24/44 to | 2/22/44 | | 30 | 75,000 |
| 2/23/44 to | 3/23/44 | | 30 | 65,000 |
| 3/24/44 to | 4/22/44 | | 30 | 40,000 |
| 4/23/44 to | 5/22/44 | | 30 | 10,000 |
| 10/26/43 to | 5/22/44 | | 210 | |

[4] From the declarations of taking it appears that the tanks were taken "until the alcohol stored in the aforesaid tanks has been removed," and there is testimony in the record which shows that the Feldmans had the use of the empty tanks.

legislation and delegate to administrative officers authority to prescribe price ceilings for particular commodities and services. Yakus v. United States, 321 U.S. 414, 64 S. Ct. 660, 88 L.Ed. 834; Lockerty v. Phillips, 319 U.S. 182, 63 S.Ct. 1019, 87 L.Ed. 1339. As part of this effort to control prices, Amendment 176 to Supplemental Regulation 14 to the General Maximum Price Regulation, 8 Fed. Reg. 7262, was promulgated, which fixed a price of one cent per barrel as the maximum price to be charged for the storage of alcohol. This figure thus became the maximum lawful market price so that any attempt to collect a greater amount became an illegal act. The validity of that order and the reasonableness of the price there fixed may not be questioned either in the District Court or in this court because § 204(d) of the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, 32, 33, 50 U.S.C.A.Appendix § 924(d), confers on the Emergency Court of Appeals exclusive jurisdiction of such questions. This provision of the Act is valid. Yakus v. United States, supra; Lockerty v. Phillips, supra.

If the Feldmans are not satisfied with the price fixed by OPA they have their remedy by application for review within OPA with a subsequent right of review by the Emergency Court of Appeals and the United States Supreme Court. They did in fact file a protest with the Price Administrator. He refused to grant an upward adjustment in the alcohol storage and handling rates. Upon reconsideration the Price Administrator affirmed his previous ruling asserting that respondents showed that they were earning about a 20% net profit under the one cent order.[5] If this court were to allow a larger amount, it would in effect be reviewing and setting aside a price order in contravention of the 1942 Emergency Price Control Act. If it had not been necessary for petitioner to resort to condemnation, it is clear that the ceiling price fixed by the OPA order pursuant to a statute in force when the Feldmans entered into the storage contract of May 12, 1942, could not have been exceeded. For some reason, the Government had to utilize condemnation proceedings in order expeditiously to acquire possession of its own property. Respondents should not be allowed to profit by this action since it did not alter their position with respect to the amount of revenue which could be

derived from their property, for the reason that the tanks could not be put to any use other than the storage of alcohol until the alcohol already contained therein had been pumped out. Here, the Government took the tanks only long enough to empty them. Hence the OPA order is applicable, and the ceiling therein set is determinative of the value of the use of the property taken.

Davies Warehouse Co. v. Bowles, 321 U.S. 144, 64 S.Ct. 474, 88 L.Ed. 635, does not aid respondents. The holding there was that the proviso of § 302(c) of the Emergency Price Control Act, 50 U.S.C.A.Appendix, § 942(c), exempted a public warehouse, which was subject to comprehensive regulation by the state as to its rates, from the Act, because it was a "public utility" within the meaning of said proviso. Respondents have not pointed to any equivalent provision or exemption here. Certainly they have failed to point out that their business falls within the proviso of § 302(c).

The judgment is reversed, and the case is remanded to the District Court for further proceedings consistent with the views herein expressed.