UNITED STATES v. IMPROVED PREMISES KNOWN AS CADILLAC BLDG., LOCATED AT NO. 60–74 COLUMBUS AVE., BOROUGH OF MANHATTAN, CITY AND STATE OF NEW YORK et al. (two cases).

Civ. 26—298, Civ. 39—728.

United States District Court
S. D. New York.

July 29, 1948.

56

Harry T. Dolan, Sp. Asst. to Atty. Gen., for petitioner-plaintiff.

Milton Loewe, of New York City, for defendant City Bank Farmers Trust Co., trustee.

KENNEDY, District Judge.

These two condemnation proceedings to fix the rental value of premises 60–74 Columbus Avenue, New York City, were tried by the late Judge Bright in the Southern District of New York on November 5, 1947. By order dated April 16, 1948, the causes were assigned to me "for trial or final disposition". By stipulations made May 5, 1948, it was agreed that I may "retain jurisdiction to adjudicate and finally determine the issue of just compensation based upon the record and pleadings heretofore made and the briefs heretofore submitted or which may be submitted * * *".

On March 26, 1943, the government in a condemnation proceeding took the use and occupancy of this building[1] for a term ending June 30, 1944. The annual rental was fixed at $110,000 by a stipulation, approved by the court on January 22, 1944. On June 29, 1944, one of the present condemnation proceedings (Civ. 26—298) was

---

[1] The land involved in this proceeding comprises the block front on the west side of Columbus Avenue between West 62nd and West 63rd Streets. On the avenue the frontage is 200 ft. 10 in., on each side street the depth of the parcel is 125 ft. The parcel is referred to on the tax map of the City of New York as lot 29, block 1154. In the year 1946-1947 the land was assessed at $490,000, the building at $910,000, the total being $1,500,000. In the following year the land was assessed at $490,000, the build-

ing at $985,000, the total being $1,475,-000.

The building is a typical reinforced concrete loft structure with twelve stories, a basement, a partial sub-basement, and mezzanine. There is a court on the westerly side of the building. The total gross area, excluding roof structures, is 343,270.64 square feet. The building is heated both by oil and by coal.

The subject building, like most of those in the neighborhood, was built to accommodate the automobile trade in 1927.

instituted only to obtain possession of the same premises from July 1, 1944, to June 30, 1945, with the right to annual extensions not beyond June 30, 1947. Again, by agreement, the rent for the period July 1, 1944, to June 30, 1946, was fixed at $126,500 per annum. It will be observed that the new rental represented an increase of fifteen per centum. It is the claim of the government that the stipulation was based upon the provisions of the New York State Emergency Rent Law, McKinney's Unconsolidated Laws of New York, Title 23, ch. 2, § 8521 et seq. The owner of the building, however, asserts that the fifteen per centum increase was merely a fortuitous circumstance, and that actually there was a compromise made without special reference to the statute. This is a minor controversy, which it is unnecessary to decide.

The government exercised its right to continue occupying the premises until June 30, 1947, but there was no agreement concerning the rent to be paid from July 1, 1946, to June 30, 1947. And this is the period for which I am called upon to fix the rental value by the first of the two condemnation proceedings.

On January 21, 1947 the government instituted the second proceeding (Civ. 39—728) to acquire the exclusive use and occupancy of the premises for the period from July 1, 1947, to December 31, 1951. No agreement concerning rental value could be reached for this period, and, therefore, I am required to determine what the correct compensation is.

At the trial and in the briefs originally submitted, the government took the position that the District Judge, in fixing compensation, was absolutely bound by the Emergency Rent Laws of the State of New York; the owner urged that the District Judge was absolutely prohibited to follow the statute and the formulae found in it. Because the parties took this position the government offered proof of rental value based almost exclusively on one of the formulae prescribed by the State Emergency Rent Law, McKinney's Unconsolidated Laws of New York, § 8524, as it existed prior to the 1948 Amendment, L.

1948, c. 676, eff. March 31, 1948. The expert called by the owner, on the other hand, ignored the Emergency Rent Law, professed himself unable to apply the emergency formulae, and based his estimate of value on rentals of "comparable" properties (but presumably unaffected by the emergency legislation). This produced a situation under which the government arrived at a fair annual rental value of $137,000 for the period July 1, 1946, to June 30, 1947, and of $140,900 for the period July 1, 1947, to June 30, 1948. The expert for the government, in support of these figures, testified concerning the first period that the fee value of the building was $1,450,000 (land $300,000, building $1,150,000). Six per centum (suggested in the New York Statute) of this amount yielded $87,000. To this was added $47,-002.45, being the owner's operating and management expenses. There was also added an annual amount of $3,000. (called "deferred maintenance") representing a further charge to which the government thought the owner was entitled. This gave a rental of $137,002.45, or in round figures, $137,000.

As for the second period (July 1, 1947, to June 30, 1948), the former rental value ($137,000.) was increased by an amount of $3,900 being an increased tax charge. And so, the government arrived at a figure of $140,900 as an annual rental for the second period.

The owner's expert, however, asserted at the trial that a study of "comparable" properties not subject to emergency restrictions justified a fair annual rental value of $186,500 for the first period, and $200,-000 for the second.

After the trial had been concluded, two cases were decided in the Circuit Court which have some bearing on the question presented, and which will be briefly discussed at a later point. Ernst v. Oberferst, 2 Cir., 1948, 166 F.2d 519; and United States v. Weisenbloom, 2 Cir., 1948, 168 F.2d 698, decided June 7, 1948. The government, as I have said originally seems to have argued that the federal court was bound by the Emergency Rent Legislation of New York, citing in the main United

58

States v. Sanitary District, 7 Cir., 1945, 149 F.2d 951; and United States v. Delano Park Homes, 2 Cir., 1944, 146 F.2d 473. The owner, on the other hand, relied on United States v. Miller, 1943, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336, 147 A.L.R. 55, and cases which followed it. The principle expressed in the Miller case is that while a federal court, sitting in a condemnation proceeding, adopts the forms and methods of procedure afforded by the law of the state, nevertheless, questions of substantive right—the measure of compensation—being grounded upon the Constitution of the United States are not ruled by local law.

It seems clear to me that the Miller case, cited by the owner, and others like it, forbid the notion that any state can set up standards of fair and just compensation binding on the federal courts. Throughout its brief the owner stresses the injustice of a holding that the government automatically becomes the beneficiary of such state legislation, but yet is not subjected to any of the detriments, procedural or otherwise, that such statutes impose upon suitors, mentioning United States v. Weisenbloom, supra, where it was held that this very New York Emergency Rent Law did not make the government subject to restrictions placed on other "landlords."

But I do not think that the argument need be pursued so far. The plain fact is that, regardless of notions of justice or equity, it would be intolerable, under our federal system, if each state could be permitted to substitute its own standards of compensation for constitutional standards, and make those standards binding in federal condemnation proceedings. Cases like Ernst v. Oberferst, supra, do not involve any such difficulty: there is no anomaly or constitutional defect in a system under which bankruptcy courts apply strictly the substantive standards found in or created by the law of the states in which they sit. And United States v. Sanitary District, together with United States v. Delano Park Homes, supra, dealt with federal, not state, regulations affecting price or value.

But even if I am right in this conclusion, it does not necessarily follow that the owner

is here entitled wholly to ignore the Emergency Rent Laws of the State of New York, and ask for compensation on the assumption, contrary to fact, that these laws do not affect the quantum of fair and just compensation under federal law.

The Legislature of the State of New York has recognized, McKinney's Unconsolidated Laws, § 8521, that in certain cities of the state, landlords have been exacting unjust, unreasonable and oppressive leases and agreements, and in the same section it is said that a rent level of fifteen per centum above the rents charged on March 1, 1943, would curb those evils. It has branded as unjust, unreasonable and oppressive any rental which exceeds this amount, or its equivalent. And it has made provisions, McKinney's Unconsolidated Laws, § 8524, for the fixing by a court of a reasonable rental based upon a different formula, but with the caution that the ingredients of this formula must be fair and reasonable in themselves. It is for an amount arrived at by the application of the calculations last mentioned that the government here contends.

I suppose no one would controvert the proposition that the federal notion of fair and just compensation is based upon the idea that a market value can be discovered: the price which a willing buyer would pay to a willing seller. But the Emergency Rent Law was inspired by and grounded upon a finding of fact by the legislature of the state that in certain cities the willing buyer-willing seller relationship had been displaced by one under which there were merely landlords guilty of oppressive exactions and tenants constrained to yield to them. Under these circumstances, the legislature thought it wise, at least during the continuance of the emergency, to restore the economic balance, as far as it could, by devising various formulae for a fair and reasonable rent, among which is the one invoked and attacked here.

It seems to me that it is my task to test the conflicting claims of the parties to this litigation in an effort to determine which of the annual rentals suggested more nearly meets the standard of what is fair and reasonable, treating the New York

statutory formula not as a mandate binding on the federal court either in whole or in part, but rather as one of several possible guides. And, of course, the method of computation suggested by the owner should be tested by the same standard of fairness.

█ If the contention of the government be adopted, the owner of this building will receive for the first period a gross yield on his investment of practically nine and one-half per centum, and a net yield of six per centum. For the second period the owner will receive a trifle over nine and one-half per centum in gross, the net return still being six per centum. In its brief the owner (assuming without conceding that the use of the statutory formula is admissible for any purpose) argues that it produces an unfair result, not because a net return of six per centum is inadequate but because the base used—the appraised fee value—is too small by $300,000. The owner's expert distinctly refused to furnish a fee value, and there is nowhere in the record any estimate of this figure supplied by the owner. The attack on the government figure is based solely upon a passage in the cross-examination of the government's expert in which he conceded that in a market unaffected by the Emergency Rent Statute he might possibly revise his estimate of fee value upward by some figure more than $100,000 but less than $300,000. Surely that testimony is too hypothetical to supply the basis for a finding of fact. Fair and just compensation is a meaningless expression, unless it has reference to actual conditions at the time of the taking, and not to something which conceivably might develop in the future.

The owner criticises the government's estimate in a second respect: it says that depreciation at two per centum on the value of the building ($1,150,000) should be included. If the owner is right in this, an item of $23,500 should be added to the government's figures. It can be seen that this amount plus six per centum on the hypothetical $300,000 just mentioned, nearly equals the arithmetical difference between the claims of the parties.

The owner's argument in support of its claim that depreciation should be included stems, I think, from a change in the Emergency Rent Law which I shall refer to as the 1948 Amendment. See McKinney's Unconsolidated Laws, § 8524, as amended by L.1948, c. 676, eff. March 31, 1948. By this amendment (which it will be observed became effective after the taking in both of the proceedings at bar and indeed after the trial) the state legislature attempted to remedy what it seems to have thought was an inequality in the law as it formerly existed.

Prior to this 1948 Amendment, the statute provided that the owner of encumbered property could be awarded as rent not only six per centum on his investment and his cost and maintenance expense, but also two per centum of the amount of the mortgage, representing amortization. The owner of unencumbered property, such as this one, was, on the face of the statute, not entitled to this item. At the trial the owner in these proceedings made much of the fact that the statutory formula resulted in preferential treatment of encumbered property. The 1948 Amendment seems to have been designed to cure this defect, if it was one, for it changed the law in such wise that the owner of unencumbered property could thereafter be given two per centum in the way of depreciation.

I must reiterate that I am dealing only with the problem, strictly under federal law, of fair and just compensation for the use of property. I must, as I have said, treat the Emergency Rent Law statute not as a statutory command but as a possible guide, made necessary by the want of others more usual.

█ Is it fair and reasonable to ask a tenant to pay a landlord an amount which not only yields to the latter a net return of six per centum on his investment, but also an amount equal to two per centum of the investment as "depreciation"? Obviously, the answer to this question depends upon what is meant by "depreciation." If that word means an actual cost to the landlord, it may be fair to compel the tenant to pay it. But if it is a mere theoretical item, it should not be included. The courts of the State of New York were clear that in its original form the statute did not include

depreciation as an item of cost and maintenance. In re Fifth Madison Corporation, 1948, 297 N.Y. 155, 77 N.E.2d 134. The Court of Appeals thought that, in the absence of proof of actual depreciation, an unconstitutional discrimination among property owners did not exist. But, in determining fair and just compensation under the federal rule, it seems equally clear that it is wrong to include within the scope of that phrase a purely theoretical item.

Beyond any doubt it appears on this record that the owner is making a claim, not for the actual cost of keeping the building in its current condition, but for a hypothetical annual reduction in the value of the building, based upon a life estimate of fifty years. It is no answer to say that perhaps the New York statute, as it now stands, may permit the inclusion of such an item. If a net return of six per centum on the landlord's investment is fair, and I think it is, it is quite unreasonable to suggest that a truly willing buyer would, in addition, undertake to write down the investment on the hypothesis that a building has an ascertainable life expectancy. Certainly that hypothesis ought to be rejected in a case such as this one where the allowed cost of maintenance is presumably adequate to preserve the building (the government's expert accepted in full the owner's claim of cost and maintenance), and where, in addition, there was included in the maintenance cost an item of $3,000. for "deferred maintenance" which points to the existence of something in the nature of a reserve.

Turning now to the basis for the rental estimates submitted in behalf of the owner, I can only say that to accept them is to fly in the face of all of the facts. To justify these estimates, one must use as standards of comparison the rental values of properties which are not comparable at all. The owner is really asking the trier of the facts to ignore, if not to cancel, the findings made by the legislature of the state concerning conditions in the real estate market. It is one thing to say that state legislation cannot make substantive changes in federal standards of fair compensation; it is quite another to say that a federal court, dealing with a fact issue, must ignore a legislative finding.

In fine, it is my judgment that even if the New York statutory formulae had never been devised, the owner of the property affected by these proceedings would be fairly compensated for the period July 1, 1946, to June 30, 1947, by an annual rental of $137,000 and for the succeeding year by an annual rental of $140,900. This represents a substantial increase in rent over that agreed upon for the prior period. It represents what I consider to be a fair return upon the landlord's investment, arrived at by the only materials for decision which the record contains.

There are, however, certain unusual features about these cases. In the first place, as I have already pointed out, the judge who tried the case is now unfortunately dead. The parties presented the facts on conflicting theories, neither one of which is completely correct, at least in my opinion. That being so, it ought to be open to the owner to supply proof, if it be so advised, on at least two questions: (1) what is the owner's version of the fee value of the land and building?, and (2) has the owner any proof that the cost and maintenance item (supplied by itself and included in full in the government's estimate of rental) is inadequate to maintain the building in its current condition? On the latter question, I have already expressed the view that on the record as it now stands, I have no choice except to find that the item of depreciation, claimed by the owner, is purely theoretical, but it may be that the owner has other factual material on this point which it did not bring forward, because of the course which the trial took.

If the parties, or either of them, desire to supplement the record, I will take the proof at any time that may be agreeable to both sides. If both sides are satisfied with the record as it now stands, a judgment will be settled on notice in conformity with this opinion.

I have filed findings of fact and conclusions of law. Naturally, I do not intend to change the conclusion already reached by me that with respect to this particular

property and under the prevailing conditions a net return of six per centum on the owner's investment is just compensation under the federal rule.