COMMODITIES TRADING CORPORATION
et al. v. UNITED STATES.

No. 46611.

United States Court of Claims.
April 4, 1949.

MADDEN, Judge, dissenting.

———◆———

Edward L. Blackman, of New York City, for plaintiffs.

Kendall M. Barnes, of Washington, D. C., and J. Frank Staley, Acting Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and WHITAKER, HOWELL, LITTLETON and MADDEN, Judges.

WHITAKER, Judge.

Plaintiffs sue the defendant for what they deem just compensation for the requisition on May 26, 1944, of 759, 750.88 pounds of whole black pepper. Plaintiffs claim that 22 cents a pound is just compensation. The defendant allowed them $50,266.76, plus an amount for delay in payment. The amount allowed was computed at 6½ cents a pound, which was the ceiling price established by the Office of Price Administration.

We are of opinion that this ceiling price is not the measure of just compensation in this case. Pepper is not perishable; it can be stored for many years without deterioration. This is an essential difference between this case and the case of United States v. John J. Felin & Co., 334 U.S. 624, 68 S.Ct. 1238, 1248.

In that case three justices of the Supreme Court expressed the opinion that the ceiling price was the measure of just compensation for the requisition of perishable goods. Two justices were of opinion that this was not the measure of just compensation, and four justices expressed no opinion on this subject one way or the other. Mr. Justice Reed, who wrote the concurring opinion in which the view was taken that the ceiling price was the measure of just compensation, made it plain in his opinion that they were dealing in that case with perishable property. In the following quotation from his opinion we have underscored his use of the word "perishable": "It would be anomalous to hold that Congress can constitutionally require persons in the position of the respondent to sell their perishable property to the general public at a fixed price or not to sell to anyone [1] and later to hold that the Government must pay a higher price than the general public where it requisitions the perishable property because of a replacement cost, greater than the fixed price. It is true that the United States by exercising its power of requisitioning compelled the respondent to sell to it; but the compulsion to sell to the general public at ceiling prices was hardly less severe. The choice was between sales at the fixed price or, at the best, economic hibernation and, at the worst, economic extinction. The two situations are so parallel that the constitutionality established maximum price may, under the circumstances here, be properly taken as the measure of 'just compensation.'

---

[1] See Yakus v. United States, 321 U.S. 414, 64 S.Ct. 660, 88 L.Ed. 834; Bowles v. Willingham, 321 U.S. 503, 64 S.Ct. 641, 88 L.Ed. 892.

That lawfully fixed market price determines what the perishable article can be sold for or its market value in any real sense. It gives to the condemnee any profit for increased value in his hands and takes nothing from him that he could lawfully obtain since consequential damages for loss of good will cannot be obtained. Such maximum price is 'just compensation.' [2]"

Even if the ceiling price is the measure of just compensation for perishable property, we do not think it can be said to be the measure where nonperishable property is requisitioned. This is so because the owner of non-perishable property has the right to hold it until after restrictions are removed, and then sell it. He is not required to sell at the ceiling price, whereas the owner of perishable property must sell at the ceiling price or let his property perish.

We have several times held that, in determining just compensation, we must take into account the plaintiff's right to hold its property until restrictions on its disposition are removed. Seven-Up Bottling Co. v. United States, 68 F.Supp. 735, 107 Ct. Cl. 402; Kaiser v. United States, 69 F. Supp. 588, 108 Ct.Cl. 47; Adler Metal Products Co. v. United States, 71 F.Supp. 239, 108 Ct.Cl. 102; Pantex Pressing Machine Co. v. United States, 71 F.Supp. 859, 108 Ct.Cl. 735.

The Government in time of war has the undoubted right to say to the citizen, if you want to sell your property you must not sell it for more than a certain price; but the Government has no right to take the property and pay for it no more than this fixed price, unless that price justly compensates the owner, taking into consideration his right to hold his property until he can get for it whatever anyone is willing to pay.

This so-called "retention value" is particularly applicable in this case. Plaintiff, Commodities Trading Corporation, was not a trader in pepper; it was rather an investor in pepper. It began buying pepper in 1933, and by Pearl Harbor Day in 1941 it had accumulated a stock of 21,000,000 pounds. It was accumulating this stock in the expectation that there would be a considerable rise in the price of pepper, at which time it expected to dispose of it.

There is set forth in finding 9 a graph showing the rise and fall in the price of pepper over a period of about 75 years. This shows a marked fluctuation in the price of it in fairly regular cycles. There is a good reason for this. Practically the entire supply of pepper comes from Sumatra, French Indo-China, and India. The pepper vine grows in the jungle. Before planting, the jungle must be cleared and it must be kept cleared. When prices are high the natives plant pepper; but when prices decline, they neglect their vines and allow them to be destroyed by the encroachment of the jungle. The resulting scarcity causes the market to rise. Prices stay high for several years because it takes about 4 years for a pepper vine to bear.

Commodities Trading Corporation bought most of its pepper at low prices in anticipation of the rise in price which the history of the industry showed must inevitably come. Except for the fact that the Government requisitioned its pepper, Commodities would have held it until the next rise in price and then would have sold it. It has been denied the right to do this by the Government's requisition. As it turned out, the price of pepper shot up to more than 40 cents immediately after restrictions had been removed, and it went on up to 75 and 80 cents.

A very great increase in price was inevitable upon the removal of restrictions. The price of pepper had greatly declined beginning in 1935 and 1936, and was still down when the ceiling price was fixed. This resulted in but little planting and in the neglect of the growing vines, which resulted, in turn, in a scarcity. In addition to this, the Japanese invasion of Indo-China and Sumatra further reduced the supply. These factors made it inevitable that there would be a very great increase in the price after restrictions were removed. Had plaintiffs' pepper not been requisitioned there was no doubt they could have con-

[2] Cf. Nortz v. United States, 294 U.S. 317, 328–329, 55 S.Ct. 428, 79 L.Ed. 907, 95 A.L.R. 1346.

tinued to hold it and could have gotten for it a price far in excess of the ceiling price fixed by the Office of Price Administration.

The determination of what is just compensation for the taking of this pepper is extremely difficult. It must be determined as of the time of the taking, and at that time there was no free market; in fact, no pepper was offered for sale in the United States during the year 1944, in which year it was requisitioned, until in October of that year when the ceiling price was increased from 6½ cents to 10 cents a pound. Prior to October 1944 Commodities, who had about 17,000,000 pounds of pepper, which was more than one-half of the total supply in the country, had agreed with the Office of Price Administration that it would put on the market 7,000,000 pounds of its pepper if the price was increased to 10 cents. When the market was increased to 10 cents, Commodities sold some 7,000,000 pounds, as it had agreed to do. Later, in the spring of 1946, the ceiling price was further raised to 16 cents, and Commodities sold its remaining stock at this price.

The sales at 10 cents a pound by Commodities were not made from choice, but rather because the Government had made strong representations to Commodities that it should not withhold from the market its supply of pepper. Sales at this price were below cost. Our finding 24 shows that the average cost to Commodities by the spring of 1944, including labor, cartage, storage, interest, insurance, taxes, and a small allowance for administration expense, was 12.7 cents. We do not think that the price of 10 cents, at which Commodities sold some 7,000,000 pounds, is the measure of just compensation.

However, in June of 1945 Commodities apparently voluntarily sold in Puerto Rico 124,000 pounds at an average price of 14.19 cents a pound. This was after the requisition, but since we are undertaking to arrive at the "retention value" of the pepper, we think it and certain other transactions occurring after the requisition are relevant.

Taking into consideration Commodities' cost and the price it undoubtedly could have secured for its pepper had it been permitted to hold it until after restrictions had been removed, and also these sales at 10 cents, at 14.19 cents, and at 16 cents, we conclude that 15 cents a pound is just compensation. This allows plaintiffs a little more than 2 cents a pound profit, and is 1½ cents a pound higher than the average price at which pepper had sold over the last 75 years.

The Commodities Trading Corporation was dissolved on January 7, 1946, but under the laws of the State in which it was incorporated it is empowered to continue to exercise the corporate powers necessary for the winding up of its affairs. Under the plan of dissolution the assets of the corporation, including this claim against the United States, were distributed to the stockholders, whose names appear below in the fractional parts set opposite their names:

William T. Hunter—385/11,000ths.
David S. Hunter—473/11,000ths.
Ruth H. Colby—473/11,000ths.
Alice D. Hunter—473/11,000ths.
Elizabeth H. Stevenson—473/11,000ths.
Marion H. Shutt—473/11,000ths.
Frederick D. Trismen—1374½/11,000ths.
Edward L. Blackman—1375½/11,000ths.
William T. Hunter, Earl A. Darr, and Philip Gillett Cole Jr., as Successor Trustees under Declaration of Trust for Katharine Pyle Cole, dated 12/5/36 —550/11,000ths.
William T. Hunter, Earl A. Darr, and Philip Gillett Cole, Jr., as Successor Trustees under Declaration of Trust for Katharine Cole (Jr.) dated 12/5/36 —550/11,000ths.
William T. Hunter, Earl A. Darr, and Philip Gillett Cole, Jr., as Successor Trustees under Declaration of Trust for Philip Gillett Cole, Jr., dated 12/5/36—550/11,000ths.
William T. Hunter, Earl A. Darr, and Philip Gillett Cole, Jr., as Successor Trustees under Declaration of Trust for Jane Rulon Cole, dated 12/5/36— 550/11,000ths.
William T. Hunter, Philip Gillett Cole, Jr., and Dwight M. Mills as Trustees of Trust created under Paragraph 12 of the Last Will and Testament of Philip Gillett Cole, Deceased— 3300/11,000ths.

At the price of 15 cents a pound, the stockholders of the Commodities Trading Corporation, named above, are entitled to recover the sum of $113,962.63, plus compensation for delay in payment computed at 4 per cent per annum on $113,962.63 from May 26, 1944 to November 27, 1945, less the amount paid plaintiffs on the latter date of $26,404.14, and plus a further sum for delay in payment computed at 4 per cent per annum on $88,829.25 from November 27, 1945, until paid.

The foregoing judgment will be distributed to plaintiffs in proportion to their respective interests as set forth above, subject to the lien of plaintiff Irving Trust Company for whatever balance remains at the time of settlement. This balance will be paid to the Irving Trust Company.

HOWELL and LITTLETON, Judges, concur.

MADDEN, Judge, dissenting.

I am unable to agree with the court's decision. We have here, apparently, the naked question whether a ceiling price for a commodity, which ceiling price was lawfully imposed by the Government, is the proper measure of just compensation for that commodity, when some of it is taken by the Government for public use. I think it is the proper measure.

On December 11, 1942, the Government imposed a ceiling price of 6.75 cents per pound on whole black pepper of the kind herein involved. There was then an enormous supply of such pepper in the country, and the market price was lower than the imposed ceiling. On February 3, 1942, the ceiling price was revised to 6.50 cents per pound, plus certain warehouse and labor charges. During the period when the first ceiling price was in effect, the market price was lower than 6.50 cents per pound. This would seem to show that the new ceiling price was reasonable, and this was probably why the plaintiff, Commodities Trading Corporation, which owned a large fraction of all the whole black pepper in the country, did not resort to the Emergency Court of Appeals, which was, by Section 204(d) of the Emergency Price Control Act of January 30, 1942, 56 Stat. 23, 32, 33, 50 U.

S.C.A.Appendix, § 924(d), given exclusive jurisdiction to review the legality of price ceilings. The ceiling price then became the maximum lawful market price. Many millions of pounds of pepper were sold by private owners to private buyers, and at that price. The plaintiff chose not to sell any of its pepper. By September 30, 1943, the total supply in the country in the hands of importers was down to about one-third of what it had been when the 6.50 cents ceiling was imposed in 1942. No doubt this reduction of supply would have resulted in a greatly increased price in an uncontrolled market. But the market, in pepper, and in most other commodities, was not uncontrolled. If, in the changed circumstances, there was something unlawful about keeping the same ceiling price that had been imposed earlier, there was, I suppose, a new opportunity to resort to the Emergency Court of Appeals for relief. The plaintiff did not resort to that Court. In May of 1944 the War Department requisitioned a small fraction of the pepper which the plaintiff owned, and in settlement offered the ceiling price for it, which price the plaintiff rejected as being less than just compensation.

We do not have here a case where the Government, with a view to taking, or diverting to its own use, the whole supply of a commodity, first sets a ceiling price and then requisitions the property. The ceiling price here in question was imposed upon a commodity in general use, and of which the Government ultimately took only a relatively small quantity. In the numerous sales and purchases between private persons, the ceiling price was the market price. It was not a free market, any more than the market for steel or wheat or gasoline or shoes was a free market. But it was the market, and was as lawfully the market as is a market strongly affected by custom duties or excise taxes or railroad rates or other governmentally imposed conditions. For one citizen to sell to another at a price above the ceiling was made a criminal offense. Yet, the court decides, if the Government itself needs for a public use, such as to feed the Army, some of the commodity, it is constitutionally required to ignore the control which it

has imposed to prevent the public economy from being destroyed, and must discriminate against those who obeyed its law and let their goods go into the channels of trade, by paying to the ones who held their goods out of the market some two and one-half times as much as the price at which other persons sold their property. I get the impression from all this that the basic though unconscious philosophy must be that control of prices in wartime is really beyond the power of the Government, yet must be tolerated because it would cost many billions to compensate all those who are financially harmed by the controls. Since it costs considerably less to pay the relatively few persons whose property is requisitioned by the Government, not the price which, in fact, their property would have brought in the market, but the price which they would have been able to get if the scarcities resulting from the war had existed and the controls made necessary by the war had not existed, they are given that artificial and speculative price. The result of this discrimination against those who let their products flow into the channels of trade in wartime, in spite of the necessary controls, will be to encourage hoarding in the hope that the Government's necessities may compel it to take the property by requisition.

I would hold that the amount awarded to the plaintiffs for their pepper was just compensation. The decision of the Circuit Court of Appeals for the Seventh Circuit, in United States v. Sanitary District of Chicago, 149 F.2d 951, was, as I read it, in accord with what I would decide.

JONES, Chief Judge, took no part in the decision of this case.