# UNITED STATES *v.* COMMODITIES TRADING CORP. ET AL.

NO. 156.

Argued January 10–11, 1950.—Decided March 27, 1950.

*Oscar H. Davis* argued the cause for the United States. With him on the brief were *Solicitor General Perlman, Assistant Attorney General Morison, Paul A. Sweeney* and *Melvin Richter.*

*Edward L. Blackman* argued the cause and filed a brief for Commodities Trading Corp. et al.

MR. JUSTICE BLACK delivered the opinion of the Court.

Commodities Trading Corporation brought this suit in the Court of Claims to recover "just compensation" for about 760,000 pounds of whole black pepper requisitioned by the War Department in 1944 from Commodities' stock of 17,000,000 pounds. The United States contended that the OPA ceiling price of 6.63 cents per pound was just compensation. Commodities denied this, claiming 22 cents per pound. It argued that Congress did not and could not constitutionally fix the ceiling price as a measure for determining what is just compensation under the Constitution. Commodities also contended that, for reasons peculiar to its own situation, application of the ceiling price in this instance would be particularly unjust. The Court of Claims fixed "just

compensation" at 15 cents per pound. In so doing, that court took into consideration what it terms "retention value," explained as an allowance for the price Commodities "undoubtedly could have secured for its pepper had it been permitted to hold it until after restrictions had been removed . . . ." The court also considered how much the precise pepper requisitioned cost Commodities, the prices at which that company sold pepper after the government requisition, subsequent OPA ceiling prices, and the average price of pepper for the past 75 years. 113 Ct. Cl. 244, 83 F. Supp. 356. We granted the petitions of both parties for certiorari. 338 U. S. 857.

*First.* The questions presented are controlled by the clause of the Fifth Amendment providing that private property shall not be "taken for public use, without just compensation." This Court has never attempted to prescribe a rigid rule for determining what is "just compensation" under all circumstances and in all cases. Fair market value has normally been accepted as a just standard. But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards.[1] Since the market value standard was developed in the context of a market largely free from government controls, prices rigidly fixed by law raise questions concerning whether a "market value" so fixed can be a measure of "just compensation." *United States v. Felin & Co.,* 334 U. S. 624. Whatever the circumstances under which such constitutional questions arise, the dominant consideration always remains the same: What compensation is "just" both to an owner whose property is taken and to the public that must pay the bill?

---

[1] See, *e. g., United States* v. *Miller,* 317 U. S. 369; *Olson* v. *United States,* 292 U. S. 246.

The word "just" in the Fifth Amendment evokes ideas of "fairness" and "equity," and these were the primary standards prescribed for ceiling prices under the Emergency Price Control Act.[2] As assurance that prices fixed under its authority by the administrative agency would be "generally fair and equitable," Congress provided that price regulations could be subjected to judicial review. All legitimate purchases and sales had to be made at or below ceiling prices. And most businessmen were compelled to sell because, for example, their goods were perishable or their businesses depended on continuous sales. Thus ceiling prices of commodities held for sale represented not only market value but in fact the only value that could be realized by most owners. Under these circumstances they cannot properly be ignored in deciding what is just compensation.

The extent to which ceiling prices should govern courts in such a decision is another matter. Congress did not expressly provide that prices fixed under the Price Control Act should constitute the measure of just compensation for property taken under the Fifth Amendment.[3] And § 4 (d) provides that the Act shall not be construed as requiring any person to sell. But § 1 (a) declared the Act's purposes "to assure that defense appropriations are not dissipated by excessive prices" and to "prevent hardships . . . to the Federal, State, and local governments, which would result from abnormal increases in prices . . . ." Congress thus plainly contemplated that these governments should be able to buy goods

---

[2] 56 Stat. 23, 50 U. S. C. App. § 901.

[3] Had Congress prescribed a rule that prices fixed under the Act should constitute the measure of constitutional "just compensation," courts upon proper challenges would have been faced with responsibility of determining whether that rule satisfied the requirements of the Fifth Amendment. *Marbury* v. *Madison,* 1 Cranch 137. Compare *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 327.

fulfilling their wartime needs at the prices fixed for other purchasers. The crucial importance of this in the congressional plan for a stabilized war economy to limit inflation and prevent profiteering is shown by the fact that during the war approximately one-half of the nation's output of goods and services went to federal, state and local governments.[4] And should judicial awards of just compensation be uniformly greater in amount than ceiling prices, expectations of pecuniary gains from condemnations might prompt many owners to withhold essential materials until the Government requisitioned them. We think the congressional purpose and the necessities of a wartime economy require that ceiling prices be accepted as the measure of just compensation, so far as that can be done consistently with the objectives of the Fifth Amendment.

*Second.* It is contended that acceptance of ceiling prices as just compensation would be inconsistent with the Fifth Amendment because such prices fail to take into account a factor designated by the Court of Claims as "retention value." This concept stems largely from the Emergency Price Control Act's provision that the Act shall not be construed as compelling an owner to sell his property against his will. Translating the provision as conferring on an owner the "right to hold his property until he can get for it whatever anyone is willing to pay," the Court of Claims held that it gave rise to a "retention value" which must be added to the ceiling price in order to meet the constitutional requirement of "just compensation."[5]

---

[4] Eighth Report of the Director of War Mobilization and Reconversion, October 1, 1946, H. R. Doc. No. 45, 80th Cong., 1st Sess. p. 7.

[5] Pertinent parts of the Court of Claims discussion of "retention value" were:

"We have several times held that, in determining just compensation, we must take into account the plaintiff's right to hold its property until restrictions on its disposition are removed. *Seven-Up Bottling*

In enacting that provision Congress merely refused to take from owners their long-existing "right to hold" until they wanted to sell. It did not create a new "right to hold" as against a constitutional Government taking, or engraft added values of any kind on property which happens to be requisitioned at a time when prices are fixed by law. We cannot justifiably stretch this provision into a command that the Government pay owners a "retention value" for property taken.

Nor can we construe the Fifth Amendment as supporting the Court of Claims "retention value" rule. In peacetime when prices are not fixed, the normal measure of just compensation has been current market value; retention value has never been treated as a separate and essential factor. True, current market value may sometimes be higher because a buyer anticipates future rises in prices. And exceptional circumstances can be conceived which would justify resort to evidential forecasts of potential future values in order to determine present market value. But the general constitutional rule declared and applied by the Court of Claims did not rest on exceptional circumstances.

A persuasive reason against the general rule declared by the Court of Claims is the highly speculative nature of proof to show possible future prices on which "retention value" must depend. In this case, for instance, no one

---

*Co.* v. *United States,* 107 C. Cls. 402; *Kaiser* v. *United States,* 108 C. Cls. 47; *Adler Metal Products Co.* v. *United States,* 108 C. Cls. 102; *Pantex Pressing Machine Co.* v. *United States,* 108 C. Cls. 735.

"The Government in time of war has the undoubted right to say to the citizen, if you want to sell your property you must not sell it for more than a certain price; but the Government has no right to take the property and pay for it no more than this fixed price, unless that price justly compensates the owner, taking into consideration his right to hold his property until he can get for it whatever anyone is willing to pay." 113 Ct. Cl. 259–260, 83 F. Supp. 357.

knew how long the war would last nor how long economic conditions due to war might lead Congress to continue price-fixing legislation. Predictions on these subjects were guesses, not informed forecasts. And even if such predictions were reasonably certain, there remained other unknowns. How much more than the ceiling price would a speculative purchaser have paid for property at the time of seizure? To what extent, if at all, would the lifting of war controls raise prices above the controlled ceilings? And as of what date should future value be estimated? The Court of Claims opinion indicates how haphazard such calculations must be: its figure of 15 cents per pound appears to be a rough judicial compromise between the ceiling price and the 22 cents claimed, not a weighted average drawn from the varied assortment of doubtful factors considered by the court. Moreover, that figure seems completely divorced from the conjectured postwar price, a factor crucially significant in the court's "retention value" concept.

An equally forceful objection to the "retention value" rule is the discrimination it would breed. Only a limited group of owners could take advantage of the rule: those who have nonperishable products so essential for war purposes that refusal to sell would result in governmental requisition. And many of these would be financially unable to withhold their goods on such a gamble. Thus owners able to hold essential nonperishable goods until requisition would become a favored class at the expense of other owners not so fortunate. Moreover, even within that favored class the "retention value" rule would create discrimination against owners impelled by a sense of duty to sell their goods to the Government at ceiling prices without waiting for requisition. A premium would be placed on recalcitrance in time of war.

A rule so difficult to apply and leading to such discriminatory and unjust results cannot be required by

the Fifth Amendment's command for payment of "just compensation."

*Third.* While there is no constitutional obstacle to treating "generally fair and equitable" ceiling prices as the normal measure of just compensation for commodities held for sale, there must be room for special exceptions to such a general rule. For unfair hardship may be inflicted on a particular dealer by valid ceiling prices which are "generally" fair. *Bowles* v. *Willingham,* 321 U. S. 503, 516–518. But the ceiling price of pepper, fair and just to the trade generally, should be accepted as the maximum measure of compensation unless Commodities has sustained the burden of proving special conditions and hardships peculiarly applicable to it.[6] *Cf. Marion & Rye Valley R. Co.* v. *United States,* 270 U. S. 280, 285.

Commodities contends that it proved the existence of such conditions. It points to the statement of the Court of Claims that the "so-called 'retention value' is particularly applicable in this case" because Commodities was an "investor" in pepper rather than a "trader." The company accumulated its large supply at intervals during the 1933–1941 period, expecting to hold it to sell when the price went up. The court found that Commodities could reasonably expect this rise: the nature of production was such that periods of abundance and scarcity were bound to alternate, and during the preceding 75 years the price of pepper had shown marked fluctuations in fairly regular cycles. Most of Commodities' pepper was bought when prices were low. It is argued that as an "investor" Commodities should not be deprived of the

---

[6] Commodities had petitioned the Price Administrator in 1943 to amend the applicable regulation so as to permit higher prices for pepper by allowances for storage expenses. This petition was denied. Nothing in the record indicates that the Emergency Court of Appeals was ever asked to consider ceiling prices for pepper.

pecuniary benefits which future high prices would have afforded but for the Government's taking.

Under this state of facts the situation of Commodities differed only in degree, if at all, from that of myriad other commodity owners who quite naturally wished to hold their goods for higher prices. Postwar inflationary influences are common and generally expected. Price cycles, seasonal and otherwise, are also well-recognized economic phenomena. Doubtless owners of steel, textiles, foodstuffs, and other goods could produce evidence similar to that offered in regard to pepper to show cyclical fluctuations in their prices. Nor would there be much difficulty in showing that a great many owners had bought, produced, or manufactured their various merchandise with the idea of withholding from markets to await expected higher prices. Many lost anticipated profits due to price control or requisition. Sacrifices of this kind and others far greater are the lot of a people engaged in war. That a war calls for sacrifices is of course no reason why an unfair and disproportionate burden should be borne by Commodities. But the facts here show no such burden on Commodities. Commodities, just like other traders in pepper and other products, bought pepper with the intention of ultimately selling on the market. No more than any other owner is Commodities entitled to "retention value," a value based on speculation concerning the price it might have obtained for pepper after the war and after price controls were removed.

Another contention is that the particular pepper turned over to the Government cost Commodities more than the ceiling price, and that this is a special circumstance sufficient to preclude use of the ceiling price here. The Court of Claims did find that the average cost to Commodities of the precise pepper taken, including labor costs, storage, interest, insurance, taxes and other ex-

penses, was 12.7 cents per pound. The Government challenges these findings and also claims that Commodities selected its high-cost pepper for delivery under the requisition. Pointing out that pepper is fungible and that the only relevant cost figure is the average cost to Commodities of all its pepper, the Government asserts that this average cost was less than the ceiling price.

We do not consider these contentions of the Government because we think that the cost of the pepper delivered provides no sufficient basis for specially excluding Commodities from application of the ceiling price. The general rule has been that the Government pays current market value for property taken, the price which could be obtained in a negotiated sale, whether the property had cost the owner more or less than that price. *Vogelstein & Co.* v. *United States,* 262 U. S. 337, 340. The reasons underlying the rule in cases where no government-controlled prices are involved also support its application where value is measured by a ceiling price. In neither instance should the Government be required to make good any losses caused by the fact that the owner purchased goods at a price higher than market value on the date of taking. Especially is this true where the resulting loophole in wartime regulation would be available only to dealers in essential nonperishable commodities who have enough funds and storage space to withhold goods until the Government is forced to requisition them.

We have considered all other contentions of Commodities and find that none of them present reasons sufficient to justify awarding Commodities an amount in excess of ceiling prices. In the final analysis all its arguments rest on the principle that the Government must pay Commodities for potential profits lost because of war and the consequent price controls. We cannot hold that the Fifth Amendment requires the Government to give owners of requisitioned goods such a special benefit.

The judgment of the Court of Claims is reversed and the cause is remanded with directions to enter an appropriate judgment based on the maximum ceiling price of the pepper at the time it was taken.

*It is so ordered.*

MR. CHIEF JUSTICE VINSON and MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

MR. JUSTICE FRANKFURTER, dissenting in part.

In 1933 Commodities Trading Corporation began to accumulate an inventory of black pepper, not as a trader in pepper but as an investor in a nonperishable commodity. It based this investment policy on the fairly regular cyclical fluctuations of pepper prices over a period of about seventy-five years. This regularity was due to the fact that pepper plantings in Sumatra, French Indo-China and India, which supplied almost all of it, fluctuated with the price of pepper in the world market. Neglect of their crops by the native growers in periods of depressed prices lowered supply; thereby prices were raised and this in turn stimulated new plantings. Since it takes the pepper plant about four years to bear, prices would normally maintain their high level for about that period. The operations of Commodities were based on the expectation that it would profitably adjust the sale of its holdings to the cyclical movement.

By 1938 Commodities had accumulated 25,000,000 pounds; by December, 1941, it had disposed of about 8,000,000 pounds. The rest it withheld from the market until the requisition here in controversy was made by the War Department, in May, 1944. December, 1941, is a significant date because a ceiling price on pepper was then established. The price at which it was pegged—6.75 cents per pound, amended shortly thereafter to 6.50 cents plus limited carrying charges—approximated the

market price at the time the free market in pepper came to an end. This free market price was responsive to the then unusually large inventory of pepper in the country, amounting to from 78,000,000 to 100,000,000 pounds, a three-year supply. The Government forbade importation of high-priced pepper from India, and the other sources of supply were cut off by the Japanese invasion. As a result, stocks rapidly declined, the fall being accelerated after the imposition of ceiling prices by a desire on the part of many importers to avoid additional carrying charges. By September, 1943, only about 28,000,000 pounds were in the hands of importers. Of this Commodities held, as we have seen, 17,000,000. From about the middle of 1942 activity had steadily shrunk and by early 1944 pepper was not for sale.

In May, 1944, the War Department requisitioned from Commodities about 760,000 pounds of black pepper. Commodities rejected the Government's offer of compensation at the ceiling price and this suit to recover "just compensation" followed.

On the basis of its "special findings of fact" the Court of Claims held that the ceiling price was not the measure of just compensation for the requisitioned pepper. It deemed the right to withhold from sale nonperishable goods until after price control terminated a value of substance to be included in ascertaining just compensation. The inclusion of this "retention value" in the present circumstances was especially appropriate, so the Court of Claims reasoned, because Commodities was not a trader but a long-term investor. After the controls were removed in 1946, pepper sold at 50 to 60 cents a pound and upward and the Court of Claims deemed these free market values relevant in determining the just compensation for the pepper requisitioned in 1944. In giving an award above the ceiling price, that court was further influenced by the fact that the cost of the pepper it attributed to

Commodities—12.7 cents per pound—exceeded the ceiling. Taking all the factors it deemed relevant into account, 15 cents per pound was found by that court to be just compensation for the pepper taking.

I. The "just compensation" required by the Bill of Rights when "private property [is] taken for public use" has a way of attracting far-flung contentions. So here, extreme positions are taken regarding the relevance of ceiling prices to "just compensation." On the one hand it is urged that ceiling prices are to be treated as though they represent value determined by a free market. On the other hand it is insisted that since it would be unjust for the Government itself to fix the compensation for what it takes, ceiling prices should be ignored. I agree with what I understand to be the Court's view in rejecting both these absolutes.

War conditions drastically change the economic environment in which a free market has its justification. The purpose of government controls is to terminate such a distorted free market. Since ceiling prices are required by law to be "generally fair and equitable"[1] and govern voluntary sales of property, they are not irrelevant in assessing just compensation. The value of private property is not immutable; especially is it not immune from the consequences of governmental policies. In the exercise of its constitutional powers, Congress by general enactments may in diverse ways cause even appreciable pecuniary loss without compensation. "Government hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the general law. . . . When [the diminution] reaches a certain magnitude, in most if not in all cases there must be an exercise of eminent domain

---

[1] Emergency Price Control Act § 2 (a), 56 Stat. 24, 50 U. S. C. App. § 902 (a).

and compensation to sustain the act. So the question depends upon the particular facts." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 413. See also *Hudson County Water Co.* v. *McCarter,* 209 U. S. 349, 355; *Pipe Line Cases,* 234 U. S. 548, 561; *Jackman* v. *Rosenbaum Co.,* 260 U. S. 22, 31.

It does not follow that controlled prices automatically meet the requirements for just compensation in the forcible taking of property simply because they replaced free market prices which could no longer be relied on to reflect the normal play of free economic forces. A system of price controls which is "generally fair and equitable" may give rise to individual instances of hardship in the requisitioning of property no matter how conscientiously and competently administered. See *Bowles* v. *Willingham,* 321 U. S. 503, 516–18. The hardship may reach such magnitude in an individual instance as to make a taking by the public at a ceiling price unjust compensation. Of course war means burdens, and there is no calculus by which they can be fairly distributed. From any point of view the ultimate sacrifices are uncompensable. But these considerations are not relevant in carrying out the Fifth Amendment. When there is a taking of property for public use, whether in war or in peace, the burden of the taking is the community's burden. The owner should be requited by that which satisfies prevailing standards of justice. This limitation upon the power of eminent domain has throughout our history been left for judicial application. We would be faced with a new problem had Congress specified that the ceiling prices should be the limit of just compensation. Such a statute would call for the usual respect to be accorded to the judgment of Congress in passing on the validity of legislation when the power of Congress to legislate is limited by broad standards and not by restrictions almost technical in their nature. We are relieved from a considera-

tion of any such question because Congress chose not to make ceiling price the measure of "just compensation." It is therefore an inescapable judicial duty to explore the elements relevant to just compensation even for the taking of property which, as to voluntary transactions, is subject to price control. The standard of just compensation is not mechanically to be replaced by ceiling prices.

It takes us some distance neither wholly to accept nor wholly to reject price ceilings as just compensation. The complications introduced by the displacement of free market prices by controlled prices serve to intensify the usual wariness against undue generalizations in ascertaining the value of specific property taken for public purposes. Cautious empiricism is the most promising attitude in dealing with problems of this sort. This means hugging as closely as possible the shore of the circumstances of the particular case.

On the present record only two issues need to be faced. In arriving at just compensation did the Court of Claims properly take into account (1) a "retention value" and (2) the cost of the pepper to Commodities.

II. The Court of Claims appears to have recognized as a component of just compensation the right of a property owner to withhold his property for some future opportunity of enhanced realization, even though he be in the same boat with all other owners for whom the ceiling price is a fair measure. In its bearing upon our immediate problem, recognition of such a "retention value" as part of the contemporaneous value of what was taken would have required the power to "divine prophetically" the war's end and the lifting of controls by Congress as well as the state of the pepper market thereafter. This is "to exact gifts that mankind does not possess." *International Harvester Co.* v. *Kentucky,* 234 U. S. 216, 223, 224. To allow such wild imagination to enter into the practical determination of what is just

compensation would merely sanction unbridled drafts on the Treasury. It would encourage every property owner to hold his goods off the market and to force the Government to requisition rather than purchase. That, by such retention, profits might be realized in the distant future is not an interest which the Constitution protects.

The diffused loss of profit throughout the nation's economy must be borne as a part of the common lot. Of a different order of loss would be a taking of the pepper at ceiling prices, if the ceiling price was far below the cost of the pepper to Commodities and such cost was incurred in the normal course of long-term holding operations. This might present a situation whereby the owner of the requisitioned property would be asked to bear more than its fair share of the just economic burden of the war.

III. The Court of Claims found that the cost to Commodities of the requisitioned pepper was 12.7 cents per pound compared with the ceiling price of 6.5 cents. The Government challenges the cost figures. It points out that Commodities kept its cost records on the basis of specific bags of pepper, each bag being recorded at its invoice cost and the applicable carrying charges. Commodities selected the bags of pepper delivered to the Government. Apparently it chose the bags which had the highest invoice cost and the greatest carrying charges, the pepper bought in 1933–1936. Assuming that costs higher than ceiling prices may affect just compensation, the Court of Claims should have considered whether the high cost of the pepper turned over to the Government was due to Commodities' accounting system. Since pepper is fungible and does not have age value, for all that appears Commodities' method of computing costs may have been unfair to the Government. "Just compensation" is not a function of a seller's theory of accounting.

The Court's opinion, however, holds that whatever the costs they are irrelevant in assessing just compensation.

Thereby the Court disregards in the concrete the principle which it avows in the abstract—namely, that ceiling prices are not to be deemed as though they were values arrived at in a free market and that individual instances of hardship may properly receive individual consideration. The Court urges that high costs would be irrelevant in peacetime when an uncontrolled market determines value. Compare *Vogelstein & Co.* v. *United States,* 262 U. S. 337. But a controlled market is not an uncontrolled market. Only by treating a controlled market as the equivalent of an uncontrolled market can ceiling prices be made the equivalent of market value and thereby the measure of just compensation.

Since "just compensation" is not easily reduced to quantitative determination, the price which is arrived at through the haggling of the market is the accepted norm in determining just compensation. The law sensibly recognizes that market price reflects fair dealing by men who are freely engaged in it. But the psychological basis for the norm is gone when the area of fair dealing is eliminated. The replacement of the free jostling of the desires of buyers and sellers by government edict is no doubt due to the realization that under the abnormal circumstances of war a free market in the sense of being uncontrolled is not a fair market. But such price regulation is the imposition of the will of outsiders and not the distillation of freely directed wills guided by self-interest. The norm of price fixing by government is thus very different from the usual price fixing by free exchange. Governmental price fixing carries its own valid titles for respect by the courts. But it does not carry that title of self-determination, as it were, which is implied by a free market price. Want of a free market value does not require us to embrace automatically the ceiling price in disregard of other relevant circumstances bearing on justice in a particular case.

Costs, unlike "retention value," do not yield inherently speculative results. Including costs in computing just compensation does not give the condemnee a "war profit" nor make inroads on the system of price controls. Such inclusion is a safeguard against discriminating hardships resulting from a formula which is generally fair but which by its nature cannot be fair to each individual. By the terms of the Price Control Act the only standard which Congress laid down for price fixing was that the ceiling price be "generally fair and equitable." The Act itself made no provision for individual relief from the general price. The administrative discretion for enforcing the Act vested in the Price Administrator no doubt authorized him to qualify the prices he fixed by procedure for individual relief therefrom. As to many commodities the maximum price schedules did include such provisions. The price regulation regarding the pepper requisitioned from Commodities contained no such provision. There was no way, therefore, by which Commodities could have had relief from any unfairness of the maximum price affecting its pepper by reason of the high cost which, on the basis of legitimate business considerations, it paid.

It is significant that Congress provided in § 4 (d) of the Emergency Price Control Act that "Nothing in this Act shall be construed to require any person to sell any commodity . . . ." 56 Stat. 28, 50 U. S. C. App. § 904 (d). This protective provision is peculiarly applicable to sellers who had acquired nonperishable property by way of reasonable investment at costs above the ceiling price. Under § 4 (d) they were not required to take a loss. But today's decision withdraws that statutory protection from those subjected to the exercise of the Government's power of condemnation. It may be that, despite § 4 (d), certain sellers with high costs would have had to sell in the private market because of economic factors. There is considerable difference, however, be-

tween hardships resulting from the impersonal workings of a general regulation and the personal operation of the power of eminent domain, under which Government officials have complete discretion to select the individual who shall give up his property at a loss for the public good.

We need not decide whether costs exceeding the ceiling price are always relevant to just compensation or the extent to which they may qualify the ceiling price. It is enough to hold that, if Commodities' costs, fairly measured, were greater than the ceiling price for pepper, it is fair to take them into account. We are not dealing here with a hoarder or with one who bought property at recklessly high costs in the expectation that, in any event, the Government would reimburse him. Commodities did not suddenly shift from "seller" to "holder" upon imposition of controls in 1941; while it reduced its total stocks between 1938 and 1941, the Court of Claims found that it was essentially a "holder" from 1933 on. Nor did Commodities make substantial sales to private persons at the ceiling price, and hold out against the Government. It merely exercised its statutory right to refuse to sell, a decision ethically justified if by selling it would incur an honest loss.

IV. The error of the Court of Claims in applying the doctrine of "retention value" requires reversal of its judgment. That court should reexamine Commodities' costs and if, under a fair accounting theory, those costs prove to be higher than ceiling, they should be considered in the computation of just compensation.

Mr. Justice Jackson, dissenting.

When Congress enacted the Emergency Price Control Act, it provided that "Nothing in this Act shall be construed to require any person to sell any commodity . . . ." 56 Stat. 28, § 4 (d), 50 U. S. C App. § 904 (d). Of course, Congress did not thereby surrender the Government's

right to requisition any goods it might want under the usual eminent domain powers and for "just compensation." Why then this provision?

It seems obvious that the purpose was to avoid just what the Court does today—making ceiling prices for voluntary sales the measure of compensation for compulsory sales. This separation was not made as a favor to profiteers. In *United States* v. *Felin & Co., 334* U. S. 624, 650, writing in dissent for MR. JUSTICE DOUGLAS and myself, I set forth considerations which weighed heavily upon those proponents of price controls who wanted the controls to operate smoothly and expeditiously and also to avoid constitutional litigation, or at least adverse decisions. I said there:

> "It is hard to see how just compensation can be the legal equivalent of a controlled price, unless a controlled price is also always required to equal just compensation. It never has been held that in regulating a commodity price the Government is bound to fix one that is adequately compensatory in the constitutional sense, so long as the owner is free to keep his property or to put it on the market as he chooses. If the Government were required to do so, the task of price regulation would be considerably, if not disastrously, complicated and retarded. It seems quite indispensable to the Government itself, for the long-range success of price controls, that fixed prices for voluntary sales be not identified with the just compensation due under the Constitution to one who is compelled to part with his property." 334 U. S. at 651.

The Court today nullifies the congressional policy that no one is compelled to sell under the Act by using the condemnation power to compel the sale and this Act to fix the price. It also makes the constitutional provision for just compensation meaningless, since the Govern-

ment may first fix the price, as if no sales were compelled, and then compel the sales at the prices so fixed. I think the constitutional power to fix prices for voluntary sale in interstate commerce is much less confined than the power to fix prices for taking property. But hereafter, the price fixed may have to be tested by whether it would be just compensation for a compulsory sale.

I agree that the court below erred in its theory of "retention value." It did so by making the same basic error this Court is making: that of combining two separate systems—price fixing and condemnation. It considered that because the Emergency Price Control Act said a claimant was not required to sell under the Act, he might retain his property for some future rise in market. But it is not that Act which makes him sell. It is under the power of eminent domain that the Government expropriates this pepper. And under that power he has no right of delay and hence no retention value. He must part with his property on demand, and the issue is what is just compensation at that time.

At the time of this expropriation there was, insofar as market prices were concerned, a controlled market in the United States—controlled by the Government that was doing the expropriating. There was also a world market, with far higher market prices, to which the Government would have had recourse had not these parties earlier imported a large supply. Moreover, while the ceiling price on whole pepper was kept at a low figure, the price on ground pepper to the public showed what seems to be an unaccountably large spread. The problem of combining all relevant considerations that go to a valuation is a difficult one.

I concur in the reversal but would return the case for redetermination of the value at the date of requisition without allowance for "retention value." I should not direct that the ceiling price be used as the sole measure of just compensation.