MaddeN, Judge,
delivered the opinion of the court:
We have for determination what amounts would constitute just compensation for certain lots of steel owned by the *494 plaintiff and requisitioned by the Government in the exercise of its powers under the Act of October 10, 1940, 54 Stat-1090; 50 U. S. C. App. 711-713.
The plaintiff is a Portuguese corporation whose business is building and repairing ships. In the summer and fall of 1941 it' purchased in the United States various iron and steel' products, consisting principally of plates, structural shapes, wire rods, and bars. The steel was purchased with the hope that it could be exported to Portugal, and, immediately after each purchase, the plaintiff’s agent filed an application with the Board of Economic Warfare for an export license. So-far as the steel involved in these suits is concerned, export licenses were denied, and, after reapplication, were again denied. Some of the steel was requisitioned by the Government in February of 1942, and the rest of it in the months of August, September, and October of that year.
During the period in 1941 when the plaintiff bought the-steel in question, the prices which steel mills could charge for steel were controlled, but resale prices of those who had acquired steel from the mills were not controlled. All of the steel here in question had been bought by the plaintiff from persons other than producing mills, and for prices higher than those which a producer could have legally charged. The ceiling prices for the mills were imposed by Price Schedule-No. 6, issued on April 6,1941. Because resale prices were not controlled, they rose sharply, and large profits were made by those who succeeded in getting steel from the producing mills. The plaintiff paid $4.50 per cwt. in June 1941 for some of the-steel involved in these cases, and as much as $9.36 in November or December.
Because of the rise in the resale price of steel, Price Schedule No. 49 was promulgated on December 15,1941. If the reseller did not put the steel through so-called “warehousing operations,” which consisted of storage, sorting, cutting, etc.,, the domestic ceiling price on resale was set at the mill price-fixed by Price Schedule No. 6. The plaintiff did not put the-steel here involved through “warehousing operations.” Price-Schedule No. 49 permitted export prices to include certain-additions to domestic prices. It also made provision for an *495 application by a reseller for a departure from the ceiling price upon a showing of hardship or inequity.
During February 1942, the Navy requisitioned four of the lots of steel involved herein. Our problem is to determine-the fair value of the steel at that time. There was a great demand for steel, and prospective purchasers were not quibbling about the price. Actually, then, the market price which a willing buyer would have paid a willing seller during this period may be said to have been whatever price the price contrbl authorities would have permitted the seller to charge. The Government says that the mill prices set by Price Schedule No. 6, which Price Schedule No. 49 made applicable to resales by owners who had not put their steel through warehousing operations, were the lawfully permitted prices, and therefore were just compensation. United States v. Commodities Trading Corp., 339 U. S. 121. The plaintiff says that in actual fact, the price control authorities would have,, upon application, permitted an owner such as the plaintiff who had acquired steel in the then uncontrolled resale market at higher than mill ceiling prices, to resell at the price he had paid. The plaintiff points to the provision in Price Schedule No. 49 for application by a prospective seller for a departure from the mill prices upon a showing of hardship or inequitj^. It says that from the time of the issuance of Price Schedule No. 49 on December 15, 1941, the Office of Price Administration had been granting exceptions in favor of persons situated as the plaintiff was. At the end of March 1942, amendments were made to Price Schedule No. 49 to show the export trade when it might expect departures from mill prices. On March 27 Amendment No. 1 was issued which permitted exceptions from ceiling prices in cases of “unusual financial hardship resulting from inability to absorb a loss which would be occasioned by sale” at the ceiling price.
In his statement of considerations, which was issued in connection with the foregoing amendment, the Price Administrator recognized that many persons who had bought steel for export when there was no ceiling price, would not now resell the steel for export at a loss, and that their holding it *496 would add warehouse and other charges to their already high costs. The statement said, as to the hardship provision, “This provision carries forward the same policy toward the granting of a special price on such inventory which was a part of Price Schedule No. 49 as originally issued.”
On March 31,1942, four days after its issuance of Amendment No. 1 to Revised Price Schedule No. 49, the Office of Price Administration issued Amendment No. 2. That document, quoted in our Finding IT, said that petitions for exception filed by persons holding high-cost inventory “must prove that serious financial losses will be imposed on the seller by sale at ceiling prices.” The statement of considerations issued with the amendment said of this provision, “This provision is in effect a continuation of the policy which has been established by the Office of Price Administration by way of construction of the hardship and inequity provision.”
What was the market value of those lots of the plaintiff’s steel which were requisitioned in February 1942, when there was a ready sale for the steel at whatever price could lawfully be charged ? The Government says that the only lawful price was the ceiling price; that, conceding that an exception might have been granted the plaintiff upon application, there was, in fact, no application made and no exception granted. The Government says that if we were to find any price other than the ceiling price to be the measure of just compensation to the plaintiff, we would be exercising the discretion which was by statute lodged only in the Price Administrator, with the right of appeal only to the Emergency Court of Appeals. We think this argument is not valid. We take it that the reason the plaintiff did not apply for a permit to sell its steel at higher than the ceiling price was that it did not want to sell its steel at all, at any price. It had bought the steel for export, for its own use, and, until the Government took the steel from it by requisition, it sought the necessary licenses to export it. There was, therefore, no reason for it to apply for an exception. After the steel had been requisitioned, it could not have applied for an exception, since such an application was permitted only when an owner desired to resell, and the plaintiff then had nothing to resell. There was nothing to appeal to the Emergency Court of Appeals. After the *497 requisition, the only question in dispute was the question of whether the compensation offered the plaintiff constituted just compensation. We think the Emergency Court of Appeals had no jurisdiction to decide that question, but whether it did or not, this Court has jurisdiction to decide it and, now. that it is presented, must decide it.
In the circumstances the question is what would the plaintiff have been permitted by law to charge for its steel if it had been willing to sell it. We think that, as to the lots requisitioned in February 1942, the Office of Price Administration would have permitted it to charge what the steel had cost it. That office had, in fact, granted exceptions to holders of high-cost inventories from the time of the issuance of Price Schedule No. 49 on December 13, 1941, and, at the end of March 1942,. by amendments to the schedule and by accompanying statements, advised the trade that such exceptions would be granted. The Government points to Amendment No. 1 of Price Schedule No. 49 which said that an exception would be made in cases of “unusual financial hardship resulting from inability to absorb a loss which would be occasioned by a sale” at the ceiling. The standard set by this language would have been difficult and uncertain in application. But this language seems to have been superseded, after only four days, by that of Amendment No. 2 which required only that the person applying for the exception “must prove that serious financial losses will be imposed on the seller” by sale at the ceiling prices. The plaintiff’s situation satisfied that requirement. The statement issued with Amendment No. 2 said that the amendment was a continuation of the interpretation which had been previously given the hardship and inequity provision of Price Schedule No. 49. This meant that the requirement spelled out in Amendment No. 2 on March 30, had, in practice, been the requirement in February, when several lots of the plaintiff’s steel were requisitioned. We conclude that the plaintiff would have, upon application, been permitted to sell its steel at the cost of the steel to it, and that purchasers were available at that price.
On April 25, 1942, the Office of Price Administration changed its policy of separately fixing maximum export prices for each commodity, and issued its Maximum Export *498 Price Regulation, the relevant parts of which are quoted in Finding 18. In § 1375.1 (a) that document said:
In the case of a person other than the manufacturer or producer of the commodity, the maximum export price shall be the price at which such commodity was acquired for export, plus the additions thereto authorized by paragraphs (a) and (b) of § 1375.2 * * *.
The plaintiff cites a bulletin distributed by the OPA to the export trade on December 3, 1942, entitled, “Questions and Answers — OPA Bulletin Explaining Maximum Export Price Regulation,” and containing the following question and answer:
B-10 Q. Where an exporter purchased and received delivery of a commodity prior to the establishment of a domestic ceiling, at a price higher than the domestic ceiling in existence at the time of the export, may he use as the basic price the cost of acquisition?
A. Yes.
It seems clear, then, that, at the time of the August-October 1942, requisitions, the plaintiff could have lawfully sold its steel for the cost to it of the steel. There were buyers available, willing to buy at that price.
The plaintiff urges that it should recover, as a part of just compensation, not only the cost to it of the steel requisitioned from it, but also certain export premiums which the OPA practice and export regulations permitted exporters to add to their costs, when they sold for export. W e think the plaintiff is not entitled to those additions. The OPA’s allowance of these additional charges in the case of a sale for export was to permit the exporter to recover the expenditures which he would have to make to accomplish the export. So far as appears, they were carefully calculated to equal the normal costs of the transaction and there is no indication in the evidence that they were intended to include a profit.for the exporter. If the plaintiff had sold the goods for export, its cost would, we have found, have been the normal costs of any exporter. The plaintiff’s steel having been requisitioned by the Government, it incurred no export expenses, and therefore needs no reimbursement of them.
*499 The Government urges that we should deduct from the amounts which the plaintiff actually paid to acquire the steel certain commissions and other charges such as the cost of letters of credit. It urges that these were the kinds of expenditures which the regulations contemplated in allowing the additions to acquisition cost permitted to exporters. Whether, if the plaintiff had exported its steel it would have been denied the export premiums we need not surmise. The fact is that these were a part of the actual costs of acquisition of the steel by the plaintiff, and we see nothing in the regulations or the OPA statements of policy to indicate that they would not have been treated as such.

Interest as a Part of Just Compensation

In the case of the three Board of Economic Warfare requisitions included in Case No. 48917, the requisitions took place in August, September, and October 1942. The BEW made determinations and awards of compensation within a few months thereafter. The plaintiff could, thereupon, have accepted 50 percent of the amount of the awards, reserving its right to sue for just compensation. It did not, however, request the 50 percent until May 21,1948. It may not, therefore, recover interest upon the 50 percent of the awards which it could have so received. It is entitled to interest at 4 percent on the amounts which we have determined to be just compensation, from the dates of taking to the dates of awards, and on the same amount, less 50 percent of the amounts of the awards, from the dates of the awards to the date of the judgment herein. It should also receive interest upon the said 50 percent of the amounts of the awards, from May 21,1948, the date on which it notified the Government of its election to receive the 50 percent of the awards, and June 20, 1949, the date on which the 50 percent was paid to it.
In the case of the five Navy requisitions, included in Case No. 48978, the requisitions took place in 1942, but not until May 31,1948, did the Navy Department make the determination of the amount of compensation which is required by the requisition statute. The plaintiff rejected the awards, and elected to receive 50 percent of their amounts, and sue for *500 the balance of just compensation. The Government paid the-plaintiff the 50 percent on September 14,1948. In these circumstances the plaintiff is entitled to 4 percent interest, as a part of just compensation, on the several principal amounts which we have determined to be the value of the lots of steel,, from the respective dates of taking until September 14,1948, and interest at the same rate upon these several amounts less,, in each case, the 50 percent which was paid the plaintiff on September 14, 1948, from September 15 to the date of judgment herein.
The plaintiff is entitled to a judgment in the amount of $140,537.50. It is further entitled to interest at 4 percent per annum on $97,683.54 from the date of this judgment until payment, not as interest but as a part of just compensation.
It is so ordered.
Howell, Judge; Whitaker, Judge; Littleton, Judge? and Jones, Chief Judge, concur.