**SWISS FEDERAL RYS. et al. y. UNITED STATES.**

**No. 48750.**

United States Court of Claims.

June 2, 1953.

---

358

John J. Wilson, Washington, D. C., for the plaintiff. Whiteford, Hart, Carmody & Wilson and Peider Konz, Washington, D. C., were on the brief.

Kendall M. Barnes, Washington, D. C., with whom was Warren E. Burger, Asst. Atty. Gen., for the defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN and HOWELL, Judges.

JONES, Chief Judge.

The Swiss Federal Railways, a branch or agency of the Swiss Government, has filed this suit to recover the value of some metallic railway tires which were requisitioned by the United States Government on May 20, 1943. Subsequent to the filing of this suit the Confederation of Switzerland was added as a party plaintiff. Since all the transactions described were carried on in the name of the Swiss Federal Railways, and for reasons set out below, the term plaintiff shall be deemed to refer to that agency throughout this opinion.

On June 20, 1940, the plaintiff, Swiss Federal Railways, ordered 420 machined, rolled, flanged railway tires in five different sizes from the Baldwin Locomotive Works, at a price of $6.39 per hundredweight. The manufacture of these tires was completed and they were shipped to

New York for export to plaintiff about November 22, 1940. Payment of the purchase price was made therefor.

Plaintiff was unable to secure a navicert from the British Government permitting the shipment of these tires through the British blockade. One hundred and ninety of them were placed in storage at Verona, Pennsylvania, and 230 at Burnham, Pennsylvania. The tires were intended for use on rolling stock of the Swiss Federal Railways in Switzerland.

About January 1, 1942, the Baldwin Locomotive Works began an effort to effect a sale of these tires for plaintiff's account. Descriptions of the tires were furnished to the company's sales agents in England, Brazil, Argentina, Chile, Colombia, Mexico, Cuba and Puerto Rico, as well as to the War Production Board and the Engineer Procurement District of the War Department. Two hundred of the tires were sold to the Paulista Railroad of Brazil on October 6, 1942, at $6.32 per hundredweight, and 12 tires were sold to the Havana Terminal Railroad Company of Cuba on October 15, 1942, at the same price. These concerns purchased only the quantities they needed at the time and were unable or unwilling to purchase any part of the balance. No other sales could be effected since the tires had been manufactured to the dimensions required to fit plaintiff's rolling stock. These were not adaptable for use by railroads in other countries where attempts were made to sell them. The tires were in good condition. If a purchaser could have been found who desired tires of that size they were in satisfactory physical condition for use as tires. There was no available market for their sale as tires. The only immediate available market on the date of the requisition was for use as scrap.

If a purchaser could have been found for the tires on the date of requisition they could have been sold on the domestic market for $5.70 per hundredweight and on the export market for $6.46 per hundredweight, f. o. b. Pittsburgh, these being established ceiling prices of the Office of Price Administration. At these prices the requisitioned tires would have amounted to $8,100.84 on the domestic market, and $9,180.95 for the export market. As scrap material the tires had a value of $1,003.14.

On May 20, 1943, the defendant, acting through the War Production Board, pursuant to the act of October 10, 1940, 54 Stat. 1090, as amended, requisitioned and took possession of the 190 of such tires which were in storage at Verona, Pennsylvania, the weight of such tires being 142,120 pounds.

On July 27, 1943, the Chairman of the War Production Board made an award of compensation for such tires. The award was made on the basis of the scrap value of the tires at the time of taking, the amount of the award being $1,003.14.

Plaintiff was unwilling to accept the award as full payment for the requisitioned tires. On February 20, 1945, the Metals Reserve Company paid to plaintiff's attorney-in-fact the sum of $501.57, that amount being 50 percent of the award made by the War Production Board.

The question is what was the value of the tires at the time and place of taking.

The plaintiff insists that it is entitled to the ceiling price of these tires either at the domestic market of $5.70 per hundredweight, or on the export market at $6.46 per hundredweight. These were the established ceiling prices. This would undoubtedly be the rate of compensation had there been a market for these tires. But there was no available market for these tires at the time and place of the requisition. Extensive effort had been made to dispose of them over a 17-month period. Only 212 of the tires could be disposed of in the limited outlet, due to the wartime conditions and the special sizes of the tires.

■ In the absence of a market the ceiling price is not the measure of recovery. It is only a top limit of what may be proved as the actual or intrinsic value of the article at the time and place of the taking.

■■ The Supreme Court has rejected the cost to plaintiff as the measure of recovery. United States v. John J. Felin & Co., 334 U.S. 624, 68 S.Ct. 1238, 92 L.Ed.

1614. It has also rejected the retention value as such as being speculative. In the absence of sufficient evidence to establish an adequate market value as the measure of recovery, we must endeavor from all the facts and circumstances, and in the light of wartime conditions, to find the actual value of these tires at the time and place of taking.

■ The defendant earnestly insists that the only market value at the time was the value of these tires as scrap metal; that there was a market for scrap, and that this must be the measure, therefore, of plaintiff's recovery. In the circumstances of this case we must also reject this as not being the proper measure of just compensation.

The defendant relies heavily upon the case of United States v. Commodities Trading Corporation, 339 U.S. 121, 70 S. Ct. 547, 94 L.Ed. 707. That was a suit for the value of pepper which was requisitioned by the Government. The cost of the pepper had been greater than the ceiling price. The Supreme Court limited plaintiff's recovery to the ceiling price. In commenting on the issue there raised the Court states, 339 U.S. at page 123, 70 S.Ct. at page 549:

"This Court has never attempted to prescribe a rigid rule for determining what is 'just compensation' under all circumstances and in all cases. * * * But when market value has been too difficult to find, or when its application would result in manifest injustice to owner or public, courts have fashioned and applied other standards. * * * the dominant consideration always remains the same: What compensation is 'just' both to an owner whose property is taken and to the public that must pay the bill?"

The defendant insists that since the Court in the Commodities case rejected the retention value as such as being too speculative and uncertain to be the final measure of recovery, especially since that price would be discriminatory against the dealers in the commodity generally who went along and delivered their pepper, that plaintiff in this case is completely out of the picture; that no actual value can be found in the tires and the plaintiff is necessarily limited to the value of the material that went into the making of the tires on the basis of scrap.

We cannot conceive of that being the basis of the value of the kind of article in issue in this case. When the opinion rendered by the Supreme Court is read as a whole it does not justify any such conclusion. It is not implicit in the language; it is not implicit in the circumstances; it is not implicit in the facts of the Commodities case. To make it apply to the case at bar would require a twisting of the expressions used out of context and out of their true meaning. In the Commodities Trading case the pepper requisitioned was a natural commodity. Its value was largely that of a natural product. The plaintiff in that case who had purchased the pepper was a dealer who was holding it for the purposes of trade.

In the Commodities case the claimant was allowed the ceiling price of the finished article. In this case the plaintiff was denied the ceiling price of the completed article and allowed only the ceiling price of scrap material.

In this case the value as raw material or scrap was less than 15 percent of what had gone into the production of the manufactured article. The labor and human energy that had gone into the production of the finished article represented more than 80 percent of its true worth. To have anyone ask a court to hold that in these circumstances the actual value of the article at the time and place of taking was only that of scrap material is almost enough to stagger credulity. Anyone who ever sat by even a dimly lit torch of reason must necessarily reach the conclusion that such a finding and payment would not constitute just compensation.

We realize that wartime conditions produce hardships and call for sacrifices. They also justify priority, allocation, ceiling prices, and in the proper circumstances, an embargo on the sale or a limit on even the use that may be made of a commodity.

But all these must be reasonable regulations and general and fair in their application in all the circumstances, due regard being given to the hardships and necessities of wartime conditions.

If the Government in carrying out these recognized powers can be justified in destroying all the essential elements that go into the production of an article, then there would be no limit to the destruction of actual values.

Would anyone contend that the Government could take the completed or partially completed works of a fine watch that was ready to be fitted into the case and, on account of wartime conditions, forbid the sale of watches and pay for the watch on the basis of the limited value of the raw material that went into its production? Would anyone dare suggest that the Government could take a man's house and by forbidding the sale of houses or limiting the sale hold the value to the scrap value of the material that originally went into the house? If this were carried to its ultimate result the Government could requisition the arms and ammunition, the trucks and cars used in wartime, and pay for them on the basis of scrap material. It could make a regulation forbidding the sale of these articles in the general market and limit their sale to the Government itself. No one would even dare suggest that it would satisfy the requirements of the Fifth Amendment to offer to pay for them on the basis of scrap material. Yet that is the ultimate effect of what is being contended for in the instant case.

There is nothing in any of the Supreme Court decisions to indicate even in the slightest degree that any such conclusion would be justified. In the various cases it emphasizes the facts which prevailed in each particular case. In almost every case the plaintiff was endeavoring to secure special consideration while other dealers in the same commodity had delivered their product to the Government and accepted the established prices which defendant's agencies had put into effect. In the Commodities Trading case the other owners of pepper had accepted the prices which had been established by the Office of Price Administration.

In any event in this case speculative retention value as such is not involved. Plaintiff was not in a position to make a profit, nor was it engaged in buying and selling tires for a profit. It wanted the tires for its own use.

If the defendant's position were to prevail in the instant case the plaintiff would be limited in its recovery to the same prices that the junk dealer would receive for the discarded pieces of iron and scrap material which he collected and offered for sale on the scrap market. This it seems to us would be rank discrimination and would not be generally fair and equitable.

We think the general principles to be applied here are more nearly like those which were applied in the case of Illinois Pure Aluminum Company v. United States, 107 Ct.Cl. 1, 67 F.Supp. 955, 957, certiorari denied 330 U.S. 834, 67 S.Ct. 965, 91 L. Ed. 1281.

In that case the plaintiff had aluminum materials that had been specially prepared and particularly fabricated for a particular purpose. For a number of years the market price of aluminum was largely governed by the price list of the Aluminum Company of America which controlled a large part of the production of aluminum. The plaintiff sought to recover on the basis of the value shown on that price list, which it claimed was the market value. A stipulation was signed by the representatives of both plaintiff and defendant setting out the value as shown by that price list. The stipulation did not, however, undertake to determine the actual value at the time of the taking. There was an allocation order and a limitation on the sale of aluminum which for all practical purposes destroyed any general market for the commodity. The defendant sought to limit the recovery to the general price of raw or basic aluminum. We rejected the contentions of both the plaintiff and the defendant and found the actual value at the time and place of taking of the partially fabricated aluminum to be

less than the list price contended for by the plaintiff and more than the basic price of raw, unfabricated aluminum contended for by the defendant. The court used the following language:

"There can be no doubt of the right of the defendant to limit the sales and use of aluminum. There is, of course, no doubt of its right to requisition aluminum in any form. The exigencies of war place this power beyond question. However, we do not believe the defendant could take bright new aluminum cut for a specific purpose, dump it into box cars with all kinds of less expensive stocks, largely destroy its value due to the form into which it had been processed, and then lump it all off at a general program price that in a large measure disregards its cost, market value, value to plaintiff, and the purposes for which it was assembled and paid for. There must be just compensation on the basis laid down by the authorities. Monongahela Navigation Co. v. United States, 148 U.S. 312, 13 S.Ct. 622, 37 L.Ed. 463; Seaboard Air Line R. Co. v. United States, 261 U.S. 299, 43 S. Ct. 354, 67 L.Ed. 664; Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; United States v. New River Collieries Co., 262 U.S. 341, 43 S.Ct. 565, 67 L.Ed. 1014; Brooks-Scanlon Corp. v. United States, 265 U.S. 106, 44 S.Ct. 471, 68 L.Ed. 934."

It is true that case was decided prior to the Felin and Commodities Trading Corporation cases, but we find nothing in those two cases or in any of the other recent decisions of the Supreme Court that would justify any finding except one based on what would be fair to both the claimant and to the public. As indicated by the Supreme Court there is no set formula that may be used and each case must be decided on its merits. We must find the actual value of the article requisitioned at the time and place of taking. This value is necessarily reduced by the insurance, storage, and transportation charges, the lack of an available market, and the cost of regular inspection and handling. These matters must be considered and naturally affect the actual value at the time and place of the requisition.

Considering the fact that the value of the tires as manufactured articles was far above the price of scrap, the fact that they were purchased for a specific use and not for a speculative purpose, and at the same time taking into consideration the wartime conditions that existed, the necessity for special allocations and priorities, the natural and proper restrictions that are placed around the disposition of materials in a period when the world is torn by war, and in the light of the various regulations and restrictions and limitations that were placed upon articles of this character and made of this material, we find that the actual value of the tires at the time and place of taking was $4,000.

The defendant raises the issue of plaintiff's right to sue. The Swiss Federal Railways is a branch or entity of the Confederation of Switzerland. True, it is not a government corporation in the same form that we have them, but it has practically the same powers, including the right to sue and be sued. The Swiss Federal Railways was the owner. The notice of requisition was given to the Swiss Federal Railways as owner. The act of October 10, 1940, supra, pursuant to the terms of which requisition was made, stipulates that the owner may sue for any balance after accepting 50 percent of any award made as just compensation. In these circumstances we can see no substantial reason why the Swiss Federal Railways should not be permitted to maintain this suit, since the Confederation of Switzerland extends reciprocal privileges to our citizens. There is no difference in the result whether the original or intervening plaintiff is given recovery, but to secure final disposition recovery will be allowed to the Swiss Federal Railways and the petition dismissed as to the intervening plaintiff, the Confederation of Switzerland.

The plaintiff, Swiss Federal Railways, has been paid $501.57. It is entitled to recover the sum of $3,498.43, plus interest on $4,000 from May 20, 1943, to July 27,

1943,[1] at the rate of 4 percent per annum; and interest at the same rate on $3,498.43 from July 27, 1943, to the date of payment, the interest being allowed not as interest but as a part of just compensation.

The petition of the intervenor, the Confederation of Switzerland, is dismissed.

It is so ordered.

HOWELL, WHITAKER and LITTLETON, Judges, concur.

MADDEN, Judge (dissenting).

The decision of the court requires the Government to pay the plaintiff approximately four times as much for the railway tires as anyone else would have paid for them. That seems to me to be an injustice to the Government and to the taxpayers who supply the Government's funds.

The plaintiff, having procured the tires, was unable to get them to Switzerland where it had expected to use them, because of the blockade by the British of shipments to Europe. It was unable to sell the tires, as tires, because no one had any use for them, on account of their unusual dimensions. The consequence was that they were, at the time, good for nothing except scrap. There was a ready market for scrap.

If the plaintiff could have held the tires until the blockade was lifted, they would then have had value as tires. That potential future value has been called "retention value." United States v. Commodities Trading Corporation, 339 U.S. 121, 70 S.Ct. 547, 94 L.Ed. 707. The Supreme Court in the Commodities case held that retention value was not a proper measure of just compensation. In spite of the court's disclaimer, I see no other basis than retention value for the court's award in the instant case.

It does, of course, always seem uneconomical and wasteful to convert to scrap things which have been manufactured at great effort and expense. But if, because of obsolescence, or a blockade, or some other circumstance, the things are of no use in their manufactured state, it is uneconomical and wasteful to preserve them merely as artifacts. If the Government's right of eminent domain is to serve its intended purpose, it must take things when it needs them. It is fiction to suppose, for the purposes of measuring just compensation, that it took them at some other time, at which time the market should have recovered, the blockade should have been lifted, or some other event adding to their value should have occurred.

---

**I.** The War Production Board was ready to pay all or 50 percent of the award to plaintiff at all times after July 27, 1943, the date the award was made.