Marvin R. Dye, J.
Pursuant to the provisions of section 676-a of the Conservation Law of the State of New York, the Genesee State Park Commission has appropriated and taken possession of certain lands hereinafter described, for the public purpose and use of Silver Lake State Park. The appropriation papers were duly filed in the office of the Department of State and filed and, recorded in the office of the Clerk of the County of Wyoming on the 23d day of July, 1962 and thereafter and on or about August 8, 1962, were personally served on Kenneth and Beulah McMasters, the then reputed owners of record.
The lands thus appropriated are shown and described on Acquisition Map No. SL 3-2, as revised and dated January 22, 1962, being part of Great Lot No. 70 of the Ogden Tract, also part of Lot No. 2 of the Cottringer Tract, Town of Castile, County of Wyoming, State of New York. The property is a triangular shaped piece of land bounded on the north by the south shore of Silver Lake; on the east by the B & 0 Railway right of way and the irregular shore line of an inlet and on the south by the north side of Perry-Silver Springs Road, containing approximately 49.2 acres. There is also a small triangular shaped parcel north- of the inlet separating it from the main parcel containing one-tenth acre for a total area of 49.3 plus acres. The frontage on the Perry-Silver Springs Road consists of about.two and one-half acres of hard land, which is overgrown with underbrush and pine trees and could be used for a building site. The remaining 46.8 acres is marshland entirely covered with water, the depths varying from two to eight feet and largely overgrown with rushes and swamp grass. At the time of the taking it was vacant and unused except that at some time in the past a ditch 25 feet wide and approximately 1,500 feet long had been dug for the apparent purpose of improving trapping conditions.
By an instrument in writing dated July 5, 1962, just two weeks and three days prior to the filing of the map and notice of appropriation, the McMasters agreed to sell the same premises to Floyd W. Ryan and Lawrence P. Ryan for the sum of $15,000, which agreement was consummated by delivery of a warranty deed dated August 14, 1962, and recorded in the office of the Clerk of Wyoming County on the same day in Liber 344 of Deeds at page 869. The deed recited a consideration of $15,000 and also that the McMasters therewith sold and assigned to the grantees ‘ ‘ any and all claims which they have *919 against the State of New York by reason of an appropriation made by the State of New York by the filing of a map and notice in the office of the Clerk of the County of Wyoming on July 23, 1962 and which was served on the parties August 8, 1962. ”
The claimants Byan, as assignees and owners of record, then filed a claim for compensation for the taking of the subject lands in the amount of $225,000, dated and verified January 18, 1963, which has been timely filed with the office of the Attorney-General and with the Clerk of the Court of Claims on January 28, 1963, and which has neither been assigned nor submitted to any other court or tribunal for decision.
At the trial the claimants adduced evidence designed to demonstrate that the highest and best use of the land at the time of taking was for development of lake front buildings and lots. To support this, a sketch of the proposed lot lay-out dated February 21, 1963 showed in substance that the area could be laid out into about 275 small water-front lots. To create such a large number of building lots out of such a small space, it was proposed to dredge channels far enough apart to accommodate two back-to-back lots fronting on the channels, access to which would be by roads or streets filled and graded out of the material dredged from the several channels; that the lots fronting on the south shore of Silver Lake would be built up by a drag line operation from soil dredged from the bed of Silver Lake. It does not appear whether the public authorities would give permission for such an operation. Water for domestic use was to be supplied from the public mains of the Town of Perry and sanitary sewage was to be provided by septic tanks.
It was estimated that the cost of laying out such a development, including a land value of $250,000, would amount to about $956,600 and that the lots would reasonably and fairly be worth at least $5000 each or an aggregate value of $1,375,000, thus providing a potential net profit of $418,400; that because of this potential for development into high density water-front cottage and building sites, its location on the shore of Silver Lake, the development and character of the environs, the proximity to the Villages of Perry and Castile and to Letchworth Park, the claimants estimate that at the time of the taking, the subject property was fairly and reasonably worth the sum of $250,000.
The appraisal and engineer witnesses for the State took a contrary view by giving testimony which warranted finding as a fact that the hightest and best use of the subject property *920 at the time of the taking was for park purposes and conservation and presentation of wildlife in a natural habitat. The engineer witness also was of the opinion that the subject property was unsuitable for development as a subdivision site based on the circumstance that the proposed dredging of channels, filling and grading of lots at such water depths was economically impracticable, coupled with the circumstance that bar and auger tests-at designated points shown on a map of the area revealed that the hard underwater bed was overlaid by a layer of decayed vegetation, soft silt and gray sand varying in thickness from three to five feet. In addition to this foundation instability, the proposed use of septic tanks for sanitary facilities— even if permitted, which permission would be doubtful because of potential lake polution — would not be practicable because of the continuing hazard of flotation due to underwater pressures. Based on the difficulties occasioned by these water and soil conditions and all of the surrounding circumstances and other factors pertinent to the sale of property, familiarity with values in the neighborhood and experience in the real estate market, the State’s appraisal witness was of the opinion that, at the time of the taking, the subject property was fairly and reasonably worth $8.00 per front foot for the 1960 feet of lake front, or $15,680.
Both appraisers tested their appraisals by reference to comparable recent sales of similar property in the neighborhood and here again, both selected comparables relating to the respective opinion as to highest and best use, for instance, the claimants pointed to sales in the vicinity of the Silver Lake Country Club and on the shores of Silver Lake, which were on improved hard ground, easily accessible by main public highways and with all domestic facilities available; the State’s expert also used Summer occupancy type parcels, operating farm lands in the vicinity selected for proximity to roads and water, which had sold for prices far less. None of the com-parables used in either instance was so similar as to be controlling, but even so, were considered as an element in determining the over-all question of highest and best use and ultimate damage.
There is no zoning in the Town of Castile or in the Town of Perry. The property at the time of taking was assessed for the amount of $1,000.
By careful consideration of all of the oral, documentary and photographic testimony and from a thorough view by walking over the hard land and around the marshland, its location on the shore of Silver Lake, its environs and relationship thereto, *921 the highway approach and its nature, the court is satisfied that the highest and best use of the subject property is for park purposes and conservation of wildlife and so finds it to be the fact.
On the issues of damages, the court is mindful that private property shall not be taken for public use without just compensation (U. S. Const., 5th Amdt.; N. Y. Const., art. I, § 7), which the courts have consistently interpreted without need of citation, as fair market value at the time of taking or, as is often said, the price which would be paid upon a sale between a willing buyer and seller, that is, by knowledgeable parties dealing at arm’s length under no compulsion to either buy or sell. The criterion basic in eminent domain is just compensation, an amount that is just to both the owner and the public (United States v. Commodities Corp., 339 U. S. 121; Matter of Port Auth. Trans-Hudson Corp., 48 Misc 2d 485, mod. on other grounds 27 A D 2d 32). There is, of course, no fixed formula but when all of the surrounding circumstances are taken into consideration, the price actually paid constitutes a strong factor having great probative value and may be relied upon with confidence as being approximately correct (Village of Lawrence v. Greenwood, 300 N. Y. 231, 237; Matter of City of New York [Gerard Swope Houses], 21 A D 2d 652, affd. 16 N Y 2d 814) for an award in a condemnation proceeding which disregards purchase price or asssessed valuation, especially in view of a wide discrepancy in the estimates of experts, will be set aside and a new trial directed in the interests of justice (Matter of City of New York [Marshall], 8 A D 2d 365).
Here, the vast discrepancy in values fixed by the experts cannot be reconciled unless we are willing to accept the claimants’ contention that the highest and best use of the subject property was for development into a high density Summer resort area which, on the showing made by this record, we cannot do. At the time of the taking there was no existent plan for the lay-out of such a development, lacking which, the appraisers were not required to regard the property as lots in the fixation of value (Matter of Putnam County, 152 Misc. 185). Here, as a matter of fact, the sketches of proposed alternate lay-outs were dated February 21,1963 and October 24, 1966, long after the filing of the notice of appropriation. Nor is there any proof to the effect that between July 5, 1962, the date of the contract of sale, and July 23, 1962, the date title vested by the filing of the map and notice of appropriation, there had been any change in the subject property materially affecting its fair market value, or that either party was under *922 compulsion to buy or sell. Everything points to the fact and it is not disputed, that it was an arm’s length transaction made in light of all the then surrounding circumstances pertinent in establishing a price to be paid to a willing seller by a willing buyer, which it is reasonable to assume also took in the circumstance that the Park Commission was then engaged in direct negotiation with owners in the area, including the McMasters, for the acquisition of property for this park purpose. What prices were being offered and accepted we do not know and it does not particularly matter for the fact is that the parties, knowing of this activity, agreed on a sale price of $15,000, which must be deemed represented the fair and reasonable market value at the time. Whatever may have been the undisclosed speculative schemes the Ryans had in mind at the time cannot be treated as controlling the quantum of the award on their subsequently filed claim — since in any event the measure of their damage is the fair market value of the property on July 23,1962 —which is to say the just compensation envisioned by the framers of the Federal and State Constitutions.
The circumstances surrounding the appropriation are not at all like those in Brighton Plaza v. State of New York (32 Misc 2d 266, 271). There a sale of the subject property had occurred shortly before the appropriation wherein the price was considerably less than the valuation asserted by the claimants, but even so, was enough to enable the seller, a knowledgeable experienced real estate speculator, to make a quick but very substantial profit on the deal. The proof there, unlike here, established that all agreed that the subject property, located as it was in the highly developed suburb of Pittsford and its proximity to the Rochester City line, was ideally situated for a shopping center development; that at the time title vested in the State the development was already well underway; approximately one year before the original residential zoning applying to the parcel had been rezoned commercial; leases with prospective tenants were being negotiated; construction plans had been prepared and conditionally approved by State and local authorities; clearing and grading of the lots had been commenced, and over $50,000 in cash had been spent. In the light of these circumstances, Presiding Judge Young, in a carefully considered opinion, quite properly rejected the price paid for a quick profit as controlling on the issue of damages but rather, was the price a willing buyer would pay to a willing seller under similar circumstances, which of course means compensation which is fair and just in light of all the proof.
*923 That is exactly our situation here. As has been said by the late Justice Brandéis, “ Value is a word of many meanings.” (Southwestern Tel. Co v. Public Serv. Comm., 262 U. S. 276, 310) which in any event is best evaluated by the record made at the trial. On this record the court is satisfied that the fair preponderance of the credible material and competent evidence favors the valuation fixed by the State’s expert in the sum of $15,680, and accordingly feels obliged to adopt, and accordingly does adopt that figure as representing the fair and reasonable market value of the subject property at the time of taking and finds as a fact that the claimants have been damaged thereby in the sum of $15,680, and are entitled to an award in that amount, with interest thereon from July 23, 1962 to January 23, 1963 and from January 28, 1963 to the date of entry of judgment.
This memorandum is intended to constitute the decision of the court (CPLR 4213, subd. [b]).