## McDONALD v. UNITED STATES.
### No. 45876.

United States Court of Claims.
June 5, 1950.

Burton K. Wheeler, Washington, D. C., and Irving Herriott, Chicago, Ill., Eugene F. McDonald, Jr., on the briefs, for plaintiff.

Kendall M. Barnes, Washington, D. C., H. G. Morison, Asst. Atty. Gen., for defendant.

Before JONES, Chief Judge, and LITTLETON, WHITAKER, MADDEN, and HOWELL, Judges.

WHITAKER, Judge.

This is a suit for just compensation for the requisition of the yacht Mizpah by the War Shipping Administration on March 16, 1942. It presents an issue that cannot be determined with any mathematical accuracy. Indeed, the determination of that compensation which is just is one of the most difficult things with which this court is confronted.

Shortly after the requisition of the vessel the War Shipping Administration deter-

mined that $116,000.00 was just compensation. This was refused by the plaintiff and thereupon the War Shipping Administration paid him $87,000.00, which was 75 percent of the amount determined, and the plaintiff brought this suit.

The Government seeks to support the administrative determination, primarily, by applying to the original cost of the vessel the rate of depreciation set out in what is known as the Rigg's scale, and by adding thereto a certain sum to take into account the superior condition of the vessel and her unusual equipment.

The plaintiff, on the other hand, seeks to recover upon the basis of the reproduction cost of the vessel depreciated on a straight-line basis at 2.7 percent per annum.

■ Cost has never been the measure of just compensation, Vogelstein & Co. v. United States, 262 U.S. 337, 340, 43 S.Ct. 564, 67 L.Ed. 1012; Commodities Trading Corporation v. United States, 339 U.S. 121, 129–130, 70 S.Ct. 547, although it may be one of the indicia to be taken into consideration in certain cases.

■ Cost is an unreliable basis because, on the one hand, the seller might have been particularly anxious to sell, even to the point of sacrificing his property, and, on the other hand, the buyer might have been sufficiently anxious to acquire the article that he was willing to pay an exorbitant price therefor. Also, costs may have risen or dropped since the purchase and the market price may have risen or fallen. Cost does not determine the measure of just compensation, and, therefore, the depreciated cost does not determine the measure of just compensation.

■ On the other hand, the plaintiff's basis of reproduction cost, less depreciation, cannot in this case be the measure of just compensation, for the reason, among others, that at the time this yacht was requisitioned no one would have thought of reproducing her. The use of private yachts at the time was subject to severe governmental restrictions; costs of labor and material were high; it seems inconceivable that anyone would have thought of reproducing this yacht at the time she was requisitioned in March 1942. Where it is necessary for the owner to replace property requisitioned, reproduction cost is properly taken into consideration, but it is not the proper basis in this case.

In Smith-Douglass Co. v. United States, Ct.Cl., 81 F.Supp. 215, we said that the cost of reproduction in most cases was quite unsatisfactory in determining just compensation for the condemnation of vessels. We went into some detail in that opinion in explaining why it was unsatisfactory. We refer to that opinion. At any rate, in this case we find it altogether unsatisfactory.

There is very little in the evidence to enable us to form an accurate estimate of that compensation which is just, but there are some things that aid us, and from a consideration of these things we believe that the amount we have arrived at is just, both to the owner and to the Government. One of the aids found in the evidence is this: In October 1940 the Navy Department directed the Commandant of the Ninth Naval District, Great Lakes, Illinois, to secure a firm offer from plaintiff for the sale of the Mizpah to the Navy at a price not to exceed $150,000. This was for the vessel delivered at the Boston Navy Yard. Plaintiff rejected this offer, but offered to sell the vessel to the Government for $263,000. We feel justified in saying that just compensation for the vessel lies somewhere between these two figures, since the depreciation sustained by her between October 1940 and March 16, 1942 is negligible.

Another aid in determining just compensation is the price at which the Arcadia, a sister ship of the Mizpah, was sold in 1940. The Arcadia was purchased from her owner for the Canadian Government in that year for the sum of about $110,000. However, the proof shows that the Arcadia was not in as good condition as the Mizpah, although she was her sister ship. In the first place, the Arcadia had been in salt water throughout her life of some 16 years, whereas the Mizpah had been in fresh water. Also the Arcadia had been severely damaged in a hurricane while tied up at Miami, Florida. Her whole side had been

ripped out during that hurricane. The damage was repaired, but the proof indicates that the plates used in repairing her were not as good as the original plates. Besides, any vessel that has been severely damaged and repaired cannot have a market value as high as one that has not been damaged and repaired. The Mizpah had never had an accident except a very minor one, in which she had run against the side of a lock, which caused a very slight, indeed a negligible, damage to two of her plates, which of course were repaired. This slight damage can be overlooked.

In addition to this, the proof shows that the Mizpah had been kept in unusually good condition. Each year it was tied up alongside the Naval Reserve Armory in Chicago or opposite the Wrigley Building, and plaintiff and his wife and children and some members of the crew lived on her during the winter. During this time her deck was housed over to protect it from the weather. Her engines were kept at all times in good condition by competent engineers. Practically every year she was placed in drydock at Sturgeon Bay, Wisconsin, and painted and otherwise overhauled. She was used only for short cruises, except in about three instances, when she took a cruise about 500 miles from Chicago up to Georgian Bay in the Great Lakes, and another to the Galapagos Islands, and another to the Caribbean. She had on her equipment not ordinarily found on a yacht, which had been added after plaintiff had bought her in 1929. These included a powerful Sperry searchlight, a Lux automatic fire-extinguisher system, a line-throwing gun, a fire-department pump in her starboard launch, and a special radio transmitter, furnished by the radio company of which plaintiff was president. She had on board a complete machine shop, extra pistons for the engines, and two extra propellers. In short, she had considerably more equipment and spare parts than would normally be on board a yacht.

When she was requisitioned by the Government, Lieutenant Commander Pieper made a careful and detailed inspection of her and found all parts of her to be in either good or very good condition, although, it is true, an inspection of her about five months after the Government requisitioned her disclosed defects that had not been discovered by Commander Pieper, if they in fact existed when he inspected her. These defects, however, were of a comparatively minor nature.

All in all, the Mizpah was in much better condition than that in which it was customary to find yachts which the Government had requisitioned, and she had equipment on her which was unusual to be found on yachts. All of these things would indicate that she had a market value considerably in excess of her sister ship the Arcadia.

Of course the sale of the Arcadia does not establish a market, but it does give some indication of what the owner of the Mizpah might have been able to realize for her if he had wished to sell her. The Arcadia was purchased by the Canadian Government from some one whose name is not disclosed in the record, and of course we know nothing about the circumstances of her owner or other details to enable us to determine whether or not the amount received for her was a fair and just price. Considering, however, the paucity of the evidence of the Mizpah's value, we think we might well assume that the owner of the Arcadia did receive something in the neighborhood of what was fair and just.

We do not regard the opinions of the experts in this case of much value, principally because the defendant's experts testified to a value based upon original cost, depreciated according to the Rigg's scale; and the plaintiff's witnesses based their valuations on reproduction cost, depreciated, neither of which bases we think is determinative in this case. It is true some of plaintiff's witnesses undertook to testify to what would have been a fair market value, independent of reproduction costs, but these witnesses, in our opinion, were not sufficiently acquainted with the vessel nor with the market to give to their testimony any particular value.

■ Taking into consideration that the sister ship of the Mizpah sold in 1940 for about $110,000.00, and taking into consid-

eration that the Navy Department was apparently willing to pay as much as $150,000.00 for the Mizpah in October 1940, and that the plaintiff was willing to accept $263,000.00, and the other considerations we have mentioned above, we are of the opinion that just compensation for the vessel on March 16, 1942, was the sum of $175,000.00. Plaintiff has been paid $87,000.00. He is, therefore, entitled to recover the sum of $88,000.00, plus, as a part of just compensation, interest on $175,000.00 at 4 percent per annum from March 16, 1942 to March 8, 1943, and interest at the same rate on $88,000.00 from March 8, 1943 until paid.

Judgment for this amount will be entered.

JONES, Chief Judge, and HOWELL, MADDEN, and LITTLETON, Judges, concur.