Whitaker, Judge,
delivered the opinion of the court:
The issue presented in this case is just compensation for the taking of plaintiff’s vessel, the Octorara, on July 28,1942.
Almost the entire testimony in the case is on the cost of reproduction of the vessel at the time of the taking, which involves the proper rate of depreciation to be applied. We are of opinion that the cost of reproduction of this vessel is not the measure of just compensation; nor is it a factor to be taken into consideration, because, among other reasons, no one at the time of her taking would have thought of reproducing her.
However, we have made findings on the cost of reproduction, for use if either of the parties cares to file a petition for certiorari with the Supreme Court.
The Octorara was a passenger vessel, and until 1936 had been in service on the Great Lakes; but she was laid up by her former owners in that year, because she could no longer be operated profitably due to the greatly increased automobile traffic around the Great Lakes.
In 1940 plaintiff purchased her and the Juniata with the intention of replacing its smaller and slower vessels with one or both of them. It spent about $690,000 in converting the Juniata into a combined passenger and automobile carrier, and put her into service in lieu of its smaller and slower vessels, which it withdrew from service. Nothing was done to the Octorara and she lay tied up at the dock until defendant requisitioned her in 1942. Whether plaintiff would ever have converted her is not known, but if it had, it probably *149 would have cost about the same amount as it cost to convert the Juniata.
In 1942 and until the end of the war all ship building plants were engaged in work for the Government and were not available for private work. The Octorara could not have been converted until after the end of the war. It is doubtful that she would have been converted then, even if she had not been sunk. Apparently the Juniata could take care of all available passenger traffic on the Great Lakes, since no move had been made to convert the Octorara during the year the Juniata had been in operation. It is highly improbable that she would have been restored to her condition new at any time. Passenger service on the Great Lakes had declined to such an extent that there was left in 1942 but four vessels engaged in passenger service. A passenger ship had not been built for service on the Great Lakes since 1915 or 1916, a quarter of a century before the requisition.
From this it seems apparent that no prudent business man would have reproduced the Octorara in 1942, or at any time in the foreseeable future. This being true, the cost of reproduction new is not indicative of “just compensation.” Smith-Douglas Co. v. United States, 126 C. Cls. 758, 789, 799-800, decided December 6, 1948, cert. den. 348 U. S. 815; McDonald v. United States, 116 C. Cls. 734, 740-741, decided June 5, 1950.
All the testimony on the cost of reproduction is the cost of reproducing her in her original condition, to wit, as a passenger vessel. If it had been desired to convert her to a freighter, her hull, engines and auxiliaries would have been of value, but there is no testimony in the record of what this value was at the time of taking. The testimony as to these parts of the vessel was as to their reproduction cost new and reproduction cost depreciated.
The only other testimony in the record from which we can arrive at just compensation is (1) what plaintiff paid for the vessel; (2) what the Maritime Commission awarded; and (3) the amount the Maritime Commission paid for other vessels, although they were not shown to be comparable to the vessel in question.
*150 In 1940 plaintiff bought the Octorara and the Juniata for $21,000 each. As stated, the Octorara had been tied up at the dock for four years. She was in need of repair. The hull was sound, but the engines, boilers, plumbing, and electrical system were in need of repair. The refrigeration was obsolete and the sanitary and sewer systems were in poor condition, portions of the decks and ladders were rotten from exposure, the exterior stairs were gone, the life boats had holes in them, the vessel needed painting throughout; she was generally in a run-down and dirty condition. No testimony has been introduced as to her value at the time of the taking in her then condition, to aid u§ in determining whether the amount paid for her was a fair price.
The Maritime Commission offered to pay plaintiff $25,000 as just compensation. How they arrived at this figure, we do not know.
In June and July 1942 defendant requisitioned a number of vessels on the Great Lakes of the approximate length and breadth, but of much greater net tonnage than the Octorara. The testimony does not show whether these were freight or passenger vessels, nor their condition. The prices paid for them run from $138,804 to $224,641.
This is all the testimony there is. It is indeed meager, The Commissioner of this court has found a value at the time and place of taking for the vessel, and it stores and equipment, of $62,000. We are not convinced that we should disturb this finding. Judgment will be entered for this amount, plus interest, as a part of just compensation, at the rate of four (4) per cent per annum from the date of the taking on July 28, 1942 to the date of payment of the judgment.
Laramoke, Judge; Madden, Judge; LittletoN, Judge; and JoNes, Chief Judge, concur.
¡FINDINGS OP PACT
The court, having considered the evidence, the report of Commissionr Marion T. Bennett, and the briefs and argument of counsel, makes findings of fact as follows:
1. The plaintiff is a Michigan corporation engaged mainly in the business of mining and shipping sand. In 1939 it *151 organized a wholly owned subsidiary, the Wisconsin-Michigan Steamship Company, which operated on Lake Michigan certain vessels owned by the plaintiff.
2. On July 26,1940, the plaintiff purchased from the Great Lakes Transit Corporation the vessels Octorara and Juniata, paying $21,000 for each. The bills of sale were conditioned upon agreement that neither the plaintiff nor subsequent purchasers would use these vessels competitively with the Great Lakes Transit Corporation for any freight transportation purposes over the latter’s then existing routes. These routes were not described. At the time of purchase, the vessels were laid up at Buffalo, not having been operated since 1936. Previously they had been used in the passenger trade between Buffalo and Detroit.
3. The Octorara was a passenger vessel built on the Great Lakes in 1910. This was a steam screw vessel of 4,329 gross tons, 2,652 net tons, having a registered length of 340.0 feet, a registered breadth of 45.2 feet, a registered depth of 28.0 feet, and four decks.
The Juniata was a passenger vessel built on the Great Lakes in 1905. This was also a steam screw vessel but one with three decks. It was of 4,333 gross tons, 2,619 net tons, a registered length of 346.0 feet, a breadth of 45 feet, and a registered depth of 28 feet.
4. The vessels being operated by the plaintiff in 1940 were too slow and small to be adequately profitable. The plaintiff had a firm of naval architects prepare plans to lengthen two of its boats, increasing their accommodations and speed, but later abandoned the project as not economical. The architects then prepared plans for new vessels, but these, too, were abandoned because bids for their construction were too high. The architects were then requested to survey the Octorara and Juniata. On examination of these vessels and after conducting tank tests with models, a determination was made that these two vessels could be converted to attain the desired speed. The plaintiff bought the two vessels and plans were prepared by the same firm of naval architects for the rebuilding of one of the boats, the Juniata being selected for the initial conversion because available information indicated that it had had slightly higher speed than the *152 Octorara, and plaintiff considered the speed to be all-important. Bids were requested on this design, but were too high, and the naval architects revised their plans to eliminate some of the items of cost. Plaintiff then took bids based on the revised design.
5. The Juniata was taken to Manitowoc, Wisconsin, for conversion in the fall of 1940. When the work on this vessel was completed it was renamed the Milwaukee Clipper and placed in service early in June 1941. The total cost of reconstruction was $689,441.47, which included $30,657.78 in fees to naval architects and consultants»
The original hull, engines, and auxiliaries of the Juniata were retained, but all of the passenger quarters were replaced by new ones and the vessel was turned into a combination passenger and automobile carrier. The vessel was converted from coal to oil and a new and improved propeller and rudder were installed. When completed, the vessel complied with all requirements of the Coast Guard and the American Bureau of Shipping. When the Juniata was placed in service, the plaintiff’s operating corporation, the Wisconsin-Michigan Steamship Company, withdrew from Lake Michigan the smaller vessels they had been operating and relied entirely on the Juniata.
6. The plaintiff did not promptly convert the Octorara as it did the Juniata although both were clearly bought for ultimate conversion purposes by the plaintiff to replace the smaller vessels, described in finding 4 as unprofitable because of their size and speed. Business formerly carried in the small vessels was transferred to the converted Juniata. There is no evidence there was sufficient business for both the Juniata and Octorara in the period 1940 to 1942. No conversion work had been started on the Octorara even after the Juniata had been in operation about a year. In 1942, the shipyards could not accept a private contract because of the priority of the Government contracts. All of the shipyards were fully occupied by business of the defendant. After the war, about 1946 or 1947, the plaintiff did buy another vessel when the Octorara was not returned by the defendant. The sum paid by the plaintiff for the ship purchased after the war is not in evidence. It was a smaller ship *153 than the one taken and was of the LST type. It was suitable only for freight.
7. In the spring of 1942 the plaintiff and the Coast Guard office in Cleveland negotiated concerning the' possibility of the Coast Guard chartering the Octorara for temporary use as a barracks ship at Buffalo. In the period since purchase the plaintiff had made no repairs of any type to the vessel and had spent no money on her except the salary of a watchman. On June 17, 1942, the plaintiff submitted an offer to let the Coast Guard charter the vessel at a monthly hire of $2,550, including insurance, with an option to renew the arrangement for four successive yearly periods. This proposed agreement was never consummated. The plaintiff had desired that, if the arrangement was made, it would be permitted to perform maintenance work and have the vessel returned after the emergency was over.
8. On July 28, 1942, the defendant, acting through the War Shipping Administration and pursuant to Section 902 of the Merchant Marine Act of 1936, as amended, requisitioned title to and took possession of the Octorara. The vessel was simultaneously turned over to the Coast Guard and then towed from its mooring to the Coast Guard base at Buffalo, arriving there about July 31,1942.
9. At the time of taking by the defendant there were consumable stores on the Octorara of a value of $564.59. There were also substantial quantities of expendable equipment in approximately 25 to 50 percent of new condition. Some of this equipment was used by the defendant and supplemented. Some of it had to be replaced but to what extent is not shown by the evidence. The cost of expendable hotel equipment to put the vessel in full passenger operation at the time of taking would have been $44,700. The vessel was not put in such condition. No payment has been made to the plaintiff for any of the consumable stores or expendable equipment taken with the vessel.
10. The Octorara had been used as a summer passenger vessel by the former owners and was used by the Coast Guard until cold weather as an emergency barracks and training ship, housing from 200 to 800 personnel. After cold weather *154 set in it was not possible to use it for such purposes because of lack of sufficient radiators to heat the upper decks.
The hull was sound but the vessel was not in good shape and showed lack of repairs and maintenance. The engines and auxiliaries were in reasonably good condition, but the engines were not operable at the time of taking, the boilers required repair as did the plumbing generally, the refrigeration system was obsolete, the electrical system needed extensive repairs, the sanitary or sewer system was in poor shape, the vessel needed paint throughout, including the hull, portions of the decks and ladders were rotten from exposure, lifeboats had holes in them, exterior stairs were gone and the vessel was generally in a rundown and dirty shape.
There were only a few tools on the ship and no spare parts. It was necessary to acquire substantial quantities of material for repairs, including pipe, lagging for the boilers, bolts, valves, electrical accessories, generator parts and heads for the feed water heaters. Most of this material came from the storeroom on the base but some was purchased in the open market. Labor was performed by Coast Guard personnel who tidied up the vessel for their use. There is no reliable evidence of the amount paid for repairs and materials while the Octorara was in possession of the Coast Guard.
11. The Octorara did not prove to be a satisfactory quarters vessel and the Coast Guard terminated all use of it on November 30, 1942, turning it over to the Army. So far as the Coast Guard was concerned, the main difficulties related to inadequate sanitary and heating facilities and lack of a modern fire prevention system. Reference has been made heretofore to the rundown condition of the vessel. There is considerable evidence regarding various estimates made to put the vessel in good operating condition. This was not done, however. A summary of the estimates is as follows:
On September 30 and October 1,1942, a Coast Guard board of four officers surveyed the Octorara to determine its fitness as a cruising training ship or quarters vessel. The board was of the opinion that it would cost $30,550 to put it into condition as a quarters boat and $82,150, including the first figure, for cruising. These estimates contemplated using service personnel for the work. Total cost on a commercial basis would have been about three times as great.
*155 The cost of making the repairs reported by the War Shipping Administration inspector who examined the vessel on the date of requisition would have been $172,415. To this should be added $44,700 for hotel equipment noted in finding 9.
The Coast Guard noted deficiencies not listed by the War Shipping Administration inspector, necessitating an additional expenditure of $45,478.
The estimates referred to above to put the vessel in good operating condition concerned plans to convert the vessel for various purposes. The estimates relate to the particular purpose which the estimator had in mind. None of the plans were carried out.
12. The Octorara had been inspected last by the Bureau of Marine Inspection and Navigation in the spring of 1936 and its last certificate of inspection was dated June 16, 1937. Bevised rules in effect that year would have required installation of a sprinkling system but it was waived for that year; Based upon the last inspection of the vessel in 1936, the Bureau would have required at least the following work to be performed before the vessel would again be certificated for service: The installation of mechanical davits for lowering lifeboats, new lifeboat shocks and disengaging apparatus, a new watertight bulkhead at frame 45, installation of approved fire detecting, alarm and patrol systems, an automatic sprinkling system and the removal of the gravel ballast, which the vessel was required to carry in her hold for stability, so that the tank tops could be inspected and any defects corrected. The Bureau also anticipated that, because of the long layup of the Octorara, other needed repairs might have been discovered.
The repairs and work referred to by the Bureau were outlined on the basis of records in the possession of the Bureau and without inspection of the vessel and were based upon the assumption that the Octorara would be placed in the same service as prior to 1936 and without reconversion.
13. As of the date of requisition of the Octorara no passenger vessel of its type had been built on the Great Lakes since 1915 or 1916. Passenger traffic had largely disappeared on the Great Lakes, due mainly to the increased construction *156 of automobiles, to an extent where it can be said that passenger vessels there no longer had any useful life for such purposes alone, although they might have a physical life of 60 to 70 years.
14. When the ship had served her purpose as a Coast Guard training and barracks ship she was not scrapped but was turned over by the defendant to the United States Army. Her superstructure was removed so that she might proceed to the Gulf of Mexico via the Illinois-Mississippi Waterway, since it was not possible for her to pass under certain of the bridges otherwise. Some of the plumbing equipment of undetermined value was salvaged. When towed to Chicago two of the four boilers were removed for use on other ships and to lighten the Octorara for towing through the Chicago Drainage Canal and River. The vessel was then towed to New Orleans where she was converted to a combination refrigerator and hospital ship and a carrier for freight, liquids, and troops. Her original engines and auxiliaries were used and it was not necessary to do repair work on the hull. The vessel later sank but this was due to negligence and not to the condition of the hull.
15. On September 20,1944, the defendant determined just compensation for the Octorara in the amount of $25,000 and on September 21, 1944, the plaintiff rejected the same as inadequate. The defendant has never paid 75 percent of the amount tendered as contemplated by the provisions of Section 902 of the Merchant Marine Act of 1936, as amended. Plaintiff’s petition claims just compensation in the sum of $1,003,333.33 with interest.
16. There is no evidence in the record of any sales of passenger vessels generally comparable to the Octorara on the Great Lakes at any period of time, other than the purchase by the plaintiff of the Juniata in 1940. The plaintiff did, in November 1941, sell the Nevada to the Maritime Commission for $204,000. The Nevada was a smaller, newer vessel than the Octorara and had had all of its passenger quarters removed in 1935 so it could be used as a freight carrier. It had been operating up to June 7, 1941, which is the only evidence from which inference can be drawn as to its condition at or near the date of sale. The plaintiff had taken the *157 Nevada out of service when the conversion of the Juniata had been completed, for the reasons described in finding 4.
17. At the time of requisition of the Octorara, the defendant also requisitioned about ten other vessels on the Great Lakes. These were not comparable vessels to the Octorara except in hull dimensions of length, breadth, and depth. They were all of approximately the same age, but otherwise their condition is not in the record. They were all of considerably less horsepower and of much less tonnage than the Octorara. The sums paid by the defendant for these vessels ran from $138,804 to $224,641 for an average of $189,994. Based upon this information and giving consideration to relative deadweights and the condition and age of the vessels, other circumstances believed relevant, and admitting that the Octorara superstructure was without value, a qualified broker and ship appraiser testified for the plaintiff that reproduction value, depreciated, of the hull and machinery of the Octorara at the time of taking was $660,000. Another gave the figure of $671,856. An officer of the plaintiff gave an estimate of $700,000 as the reproduction cost, depreciated, for the hull and machinery.
18. Estimates of the cost of reproduction, new, of the Octorara at the time of taking in July 1942 vary only moderately. One qualified witness for the plaintiff estimated the reproduction cost at a total of $1,815,000, with wooden joiner work of $324,000 and cost of reproducing the steel hull, machinery, and auxiliaries being $1,491,000 of the total figure.
Another qualified witness for the plaintiff estimated the cost of reproduction at the time of taking as $1,932,380. Of this sum, $402,320 would represent joiner and cabinet work and $1,530,060 the steel hull, machinery, and auxiliaries.
The defendant’s figure on reproduction, new, was $1,950,000, and reproduction, depreciated, based on a 40-year life, $178,000. This latter figure was developed from a “reducing balance” method used by a Canadian firm. This method entails establishment of a percentage rate of depreciation per annum applied to the depreciated value of the vessel at the beginning of each year. In this case the rate of depreciation arising from the 40-year life figure and 5 percent scrap value is 7.2 percent per annum.
*158 19.. The reproduction cost, new, of the Octorara in 1942 is found to be $1,950,000. When tbis figure is modified by the application of a rate of depreciation of 5 percent on diminishing balances over the life of the vessel, the value of the Octorara in 1942 is computed to be $377,737.48. On the basis of the vessel having a useful life of 60 years, the remaining, or salvage value of the ship at that time (1970) would be computed as $85,344.90. This assumes that proper care, use, maintenance, repairs and replacements as required, during its lifetime years of service were rendered as required.
The Octorara, however, had been withdrawn from service in 1936 and had not been in use between that date and the date of taking. No maintenance costs, apart from watchmen’s wages, were incurred in the interval to arrest or minimize depreciation.
20. Had the defendant not taken the vessel and had the plaintiff converted it as it did the Juniata, only the hull, engines, and auxiliaries would have had value to the plaintiff. These parts of the vessel had a useful life for use on the Great Lakes of 60 years, and were in reasonably good condition at the time of taking. Costs of such painting, as was done to the hull, and work on the engines after taking are not established. The evidence does establish that no prudent businessman would have or could have reproduced the Octorara in 1942. Only the parts mentioned above as of utility possibly could have or would have been reproduced. It is not established that in 1942 a prudent man engaged in the trade would have reproduced these parts of the vessel or the vessel as a whole at a cost approaching estimates indicated above on the likelihood that it would have been profitable to do so. On the contrary, it is found that a prudent man would have done what the officers of the plaintiff did, namely, buy for a comparatively nominal cost another vessel with reasonably sound hull, engines, and auxiliaries which could be stripped down or converted when business conditions indicated it would be advisable to do so. It is found that the fair and reasonable value of the Octorara, its stores and equipment at the time of taking, July 28,1942, excluding enhancement, was $62,000.
*159 CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes that as a matter of law the plaintiff is entitled to recover, and it is adjudged and ordered that it recover of and from the United States the sum of sixty-two thousand dollars ($62,000) together with interest at four (4) percent per annum from the date of the taking on July 28, 1942 to the date of payment of the judgment, not as interest but as a part of just compensation.